UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WAREHOUSE WINES & SPIRITS, INC.,

      Plaintiff,

   -v-

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

      Defendant.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 31, 2015

13 Civ. 5712 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

  On July 23, 2013, plaintiff Warehouse Wines & Spirits, Inc. ("Warehouse Wines"), a retail seller of wine and liquor, filed this action in the Supreme Court of the State of New York against Travelers Property Casualty Company of America ("Travelers") after Travelers denied Warehouse Wines' insurance claim for stolen product. On August 15, 2013, the action was removed to federal court. (ECF No. 1.) Warehouse Wines alleges that it lost over 4,000 cases of its wine and liquor when the product was stolen by James Ceseretti, who ran the warehouse in which Warehouse Wines stored excess inventory. On January 9, 2015, Ceseretti pled guilty to grand larceny in the second degree for the theft of property from Steven Goldstein, President of Warehouse Wines, in excess of one million dollars.

  Warehouse Wines submitted a claim under its first party property insurance policy with Travelers for loss of inventory. Travelers denied the claim based on, inter alia, the "Dishonest Acts" exclusion in the policy, which precludes coverage where a loss is caused by the dishonest acts of a person "entrusted with the

property". The parties agree that Warehouse Wines entrusted its wine and liquor to Ceseretti and his warehouse. As Ceseretti has already admitted guilt to the theft, there is also no dispute as to a dishonest act occurring. However, there is an exception to the "Dishonest Acts" exclusion for "property in the custody of a carrier for hire". The ultimate question before the Court is whether Ceseretti or whichever of his two companies that operated the warehouses – Bestway Warehouse & Transportation, Inc. or Bestway Logistics Transportation, Inc. – falls into the "carrier for hire" exception. If the "carrier for hire" exception does not apply, Travelers was within its contractual rights to deny Warehouse Wines' claim under the "Dishonest Acts" exclusion.

Before this court are the parties' cross-motions for summary judgment. (ECF Nos. 46, 52.) Following the submission of those motions, Travelers filed a motion to amend its prior responses to Warehouse Wines' request for admissions. (ECF No. 77.)[1] It seeks to amend admissions where it stated, due to supposed error by counsel, that it is unclear which of Ceseretti's companies operated the warehouse and which transported property. The motion to amend, made after summary judgment motions have been filed, is denied; but any lack of clarity by Travelers as to the operator of the warehouse is ultimately irrelevant as the property was simply not in the custody of a carrier for hire when stolen from the warehouse.

---

[1] Warehouse Wines responded to this filing with an opposition brief (ECF No. 84) that Travelers complained "is really an improper sur-reply in opposition to Travelers' Motion for Summary Judgment" (ECF No. 85.) Warehouse Wines explained that its own submission of exhibits was primarily meant to demonstrate that Travelers lacked good cause to make its motion because the information upon which it relies to justify amendment was in its possession prior to the submission of its summary judgment motion. (ECF No. 86.)

Simply put: Ceseretti and his Bestway Warehouse & Transportation company were conducting business as a warehouse – not a carrier – when the theft occurred. Warehouse Wines had a written agreement for the warehousing of its merchandise. There was no time limitation to their storage and the warehouse was not used as a temporary way station while the goods waited to be transported elsewhere. The name of Ceseretti's company included the word "Warehouse." If this is not a warehousing operation, what is? Instances of confusion regarding the similar names of Ceseretti's two Bestway companies do not create a genuine dispute of material fact as to the true operator of the warehouse. Warehousing and delivery were billed separately. James Ceseretti and his mother Barbara Ceseretti, who handled clerical tasks associated with both Bestway companies, each testified that Bestway Warehouse & Transportation operated the warehouse while Bestway Logistics Transportation owned the trucks. Ceseretti stole Warehouse Wines' wine and liquor while the goods were in storage at the warehouse – not while they were in any stage of transport. The warehousing operation was not a carrier for hire; accordingly, the "Dishonest Acts" exclusion precludes coverage of the loss.

I.    FACTUAL BACKGROUND

    A.    <u>The Relationship Between Warehouse Wines and Ceseretti</u>

Plaintiff operates a wine and spirits retail store in Manhattan. Steven Goldstein, its President, sole officer and only stockholder, employs a strategy of making large wholesale purchases to obtain discount offers; accordingly, it utilizes public warehouses to store excess inventory. (Warehouse Wines' Responsive 56.1

Statement ¶¶ 1, 2, ECF No. 55.)  In 2008, Goldstein entered into a business relationship with James Ceseretti to warehouse merchandise at Ceseretti's new facility in Hauppauge, New York.  Ceseretti ran two companies – Bestway Logistics Transportation and Bestway Warehouse & Transportation – for which he handled all operations, paid the rents, paid the employees and taxes, paid vendors and directed.  (Id. ¶ 21.)  Although Ceseretti himself testified that Bestway Warehouse & Transportation was the entity which operated the warehouse, the parties dispute which of Ceseretti's two corporate entities operated the warehouse.  (Id. ¶¶ 5-8.)  During the course of the business relationship, a portion of inbound shipments from distributors to the warehouse on behalf of Warehouse Wines were signed for by James Ceseretti.  (Id. ¶ 10.)  Typically, Ceseretti himself and Paul Montaldo would assemble pallets for shipment when Goldstein wanted items removed from the warehouse to his store.  (Id. ¶ 14.)

In addition to storing the product, Ceseretti would deliver product from the warehouse to Warehouse Wines using trucks registered in the name of Bestway Logistics Transportation.  (Id. ¶ 15.)  Barbara Ceseretti, James's mother, handled clerical tasks associated with both the warehouse function and delivery function.  (Id. ¶ 16.)  Barbara Ceseretti invoiced Warehouse Wines on a monthly basis for the storage fees on paper bearing the legend "Bestway Logistics Transportation".  (Id. ¶ 19.)  She invoiced the delivery services on paper bearing the legend "Bestway Warehouse & Transportation".  (Id. ¶ 20; Sipple Decl., Ex. J.)  The two Bestway

4

companies share a common bank account and maintained no separate records of their individual revenues or expenses. (Id. ¶¶ 21-22.)

    B.    The Loss

Ceseretti eventually began to come up short with his deliveries to Warehouse Wines. In February 2011, he was unable to deliver cases of Captain Morgan rum to Warehouse Wines despite records indicating that there should have been 31 cases in the warehouse. (Id. ¶ 24.) In November 2011, he was unable to deliver 3 cases of Dom Perignon although the cases should have been in the warehouse. (Id. ¶ 25.) By early December 2011, he was unable to deliver a particular Belvedere vodka although he was supposed to have 60 cases. (Id. ¶¶ 26-27.) Warehouse Wines' order on December 23, 2011 was short 53 of the 591 expected cases. (Id. ¶ 28.) On December 27, 2011, Goldstein learned from Mitch Herman, the other major wine and liquor customer of the Bestway warehouse, that Herman was missing 4,701 cases out of 9,056 for a loss of approximately $700,000. (Id. ¶¶ 30-34.) Ceseretti assured Goldstein at a meeting the following day that all of his products were ok except for Jack Daniels liter cases, Johnny Walker Black liter cases and Belvedere 750 ml silver. (Id. ¶ 36.) On January 3, 2012, Goldstein inspected the warehouse and discovered a loss of approximately 4,000 cases he calculated to be worth approximately $1,200,000. (Id. ¶ 37.)

On May 23, 2013, James Ceseretti was arrested and charged with the theft of property belonging to Warehouse Wines and Herman from his warehouse. Ceseretti, Bestway Logistics Transportation, and Bestway Warehouse &

Transportation were each indicted in connection with the theft. (Id. ¶ 42.) Count One of the indictment alleged that each of the defendants "acting in concert and each aiding the others, on or about and between 2010 and December 22, 2011, in Suffolk County, New York, stole property from Steven Goldstein and the value of said property exceeded one million dollars ($1,000,000)." (ECF No. 90).

On January 9, 2015, Ceseretti pled guilty in the Supreme Court of the State of New York County of Suffolk to grand larceny in the second degree to Count One of the Indictment. (Id.) In exchange for Ceseretti's guilty plea, indictments against the two companies through which Ceseretti conducted business with Warehouse Wines – Bestway Warehouse & Transportation, Inc. and Bestway Logistics Transportation, Inc. – were dismissed as being "covered by [Ceseretti's] plea." (Tr. at 11:9-12, ECF No. 90.)

    C.    The Insurance Policy

Prior to the theft, Warehouse Wines and Travelers had agreed to a first party property insurance policy (the "Policy") which insured Warehouse Wines against certain risks of direct physical loss to its property. The "Property Floater Coverage" section of the Policy provided coverage only while the goods were in storage at the Bestway warehouse, subject to a limit of $4 million and a $25,000 deductible.[2] The "Transportation Coverage" section of the policy provided coverage while the goods were in transit by a motor truck carrier, subject to a $60,000 limit and a $1,000 deductible. Both sections of the Policy contain dishonest acts exclusions which read:

---

[2] In addition, the Policy provided coverage for goods stored at two warehouses unrelated to this litigation.

6

> 2. We will not pay for a "loss" caused by or resulting from any of the following:
>
> \* \* \*
>
> > d. Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives or anyone entrusted with the property, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.
> >
> > This exclusion does not apply to property in the custody of a carrier for hire.

(Sipple Decl. ¶ 25, ECF No. 54.) The term "carrier for hire" is not defined in the agreement. Black's Law Dictionary defines "carrier" as "an individual or organization (such as a shipowner, a railroad, or an airline) that contracts to transport passengers or goods for a fee." BLACK'S LAW DICTIONARY (10th ed. 2014).

On April 24, 2012, Warehouse Wines filed its Sworn Statement in Proof of Loss, stating a loss of 4,095 cases of wine and liquor with a claimed value of $1,155,480. (Sipple Decl., Ex. S.) The statement asserted that the amount of insurance in force was "$4,000,000 at Location", reflecting a claim made under the "Property Floater Coverage" which applies only to property in storage at the Bestway warehouse. Warehouse Wines made no claim that its loss occurred while the property was in transit and subject to the $60,000 limit of the "Transportation Coverage." Travelers denied coverage and rejected the Proof in a letter dated August 6, 2013. (Sipple Decl., Ex. X.)

II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see

also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.  DISCUSSION

There is no dispute as to the existence of an insurance contract wherein Travelers agreed to "pay for 'loss' to Covered Property from any of the Covered Causes of Loss." (McGill Decl., Ex. 12.) That policy, however, contains an exclusion covering loss resulting from the dishonest act of someone entrusted with the insured property. There is no dispute that Ceseretti stole Warehouse Wines property that he was entrusted to store in his own warehouse. That fact is made clear by Ceseretti's guilty plea. This dispute instead centers on whether the "carrier for hire" exception to the "Dishonest Acts" exclusion in the insurance contract between Warehouse Wines and Travelers applies.

It does not. Ceseretti separated the warehouse function and the delivery function of his operation into two different companies sharing similar Bestway

9

names.  Ceseretti billed Warehouse Wines separately for warehousing fees and delivery services.  Since companies transporting goods for a fee are considered carriers, Warehouse Wines argues that Bestway Logistics Transportation – Ceseretti's company that transported goods in its delivery trucks – also operated the warehouse.  They assert that the goods stolen from the warehouse were therefore in the custody of a carrier.  Their argument fails.  Warehouse Wines merely relies upon the use of confusingly similar names to create a triable issue as to the operator of the warehouse where none exists.  James Ceseretti and Barbara Ceseretti both identified Bestway Warehouse & Transportation as the operator of the warehouse.  That company has "warehouse" in its name and agreed with Warehouse Wines to store its wine and liquor indefinitely.  The company acted like a warehouse in all respects.  Warehouses are not carriers.  James Ceseretti stole the goods while they were in storage at the warehouse – not while they were in any stage of transport.  Accordingly, the "Dishonest Acts" exclusion precludes coverage of the loss and the carrier for hire exception does not apply.

A.  Dishonest Act Exclusion

Once a plaintiff has established that it sustained a loss to covered property, the burden shifts to the insurance company to prove that the claimed loss is subject to an exclusion.  See Int'l Paper Co. v. Continental Cas. Co., 35 N.Y.2d 322, 327 (1974).  The "Dishonest Acts" exclusion in the contract between the parties bars coverage where a claimed loss results from a dishonest act by, among others, anyone entrusted with the insured property.  (Sipple Decl. ¶ 25.)  Although the

parties dispute exactly which entity was the custodian of the property at the time of the theft, it is undisputed that Warehouse Wines entrusted its property to James Ceseretti and whichever of his companies that operated the warehouse. (See Pl. Opp'n at 17.)

Courts in New York have held that exclusions for the dishonest acts of persons to whom the insured entrusts its property are enforceable. See, e.g., Superior Steel Studs. Inc. v. Zurich N.A., Inc., 368 F. Supp. 2d 208 (E.D.N.Y. 2005) (applying the exclusion to bar insurance coverage for theft of steel coils by officers of the company who had been given the property for processing); Cougar Sport, Inc. v. Hartford Ins. Co., 737 N.Y.S.2d 770, 771-72 (Sup. Ct. N.Y. Cty. 2000), aff'd, 733 N.Y.S.2d 151, 152 (1st Dep't 2001) (applying the dishonest acts exclusion to bar coverage for thefts committed by a warehouseman). In Cougar Sport, the plaintiff was an importer of children's clothing who arranged for some of its goods to be delivered directly to one of several warehouses for storage. Id. at 771-72. When one of the warehouses sold all of the goods without authority from the plaintiff, the plaintiff made a claim to its insurer for the loss. The insurer denied the claim based upon a similar exclusion for dishonest acts as exists here. That court rejected the plaintiff's argument that the concept of entrustment should be "limited to receipt by one who has the power to dispose of the goods, like a consignee, or a merchant who deals with goods of that type under Uniform Commercial Code § 2–403." Id. at 774. It instead found that "entrust" must be given its ordinary meaning, and that the plaintiff's surrender, delivery or transfer of possession of its goods to the warehouse

11

with confidence that the property would be used for the purpose it intended amounted to entrustment. Id. at 772-73. Here, the parties admit that Warehouse Wines entrusted its property to Ceseretti when it directed its suppliers to deliver excess inventory to his warehouse.

There is also no issue of material fact as to whether Ceseretti and the warehouse company stole the majority of Warehouse Wines' lost property. Travelers presents a slew of evidence pointing to the conclusion that Ceseretti and the company which operated the warehouse were responsible for the theft. (Travelers' Mem. of L. in Supp at 14-20.) Ceseretti's theft of property from his own warehouse is exactly the type of action covered by the "Dishonest Acts" exclusion.

Accordingly, Warehouse Wines' loss was caused by the dishonest acts of someone "entrusted with the property." There can be no dispute that Travelers has met its initial burden of showing that the "Dishonest Acts" exclusion applies to Warehouse Wines' claimed loss.

    B.    <u>Carrier For Hire Exception</u>

New York law holds that "after an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies." Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 121 (2d Cir. 2012); see also Northville Indus. Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 621 (1997) (if the insurance company sustains its burden of proving the application of an exclusion barring coverage, "the burden shifts to the insured to demonstrate than an exception to the exclusion

12

applies"). To avoid summary judgment, Warehouse Wines must demonstrate that their loss is in fact covered by the insurance policy because its property was "in the custody of a carrier for hire."

Ceseretti separated the warehouse function and the delivery function of his operation into two different companies that shared the common Bestway name and some common bookkeeping practices. Barbara Ceseretti, the person who handled the clerical tasks, issued two different sets of bills on two different letterheads for storage and delivery functions. The parties agree that whichever of James Ceseretti's two companies operated the warehouse is, along with Ceseretti himself, responsible for the theft of the inventory – i.e. that company committed a dishonest act. (Pl. Opp'n at 17.) Ceseretti exercised complete dominion and control over the two companies involved in his relationship with Warehouse Wines. He handled all operations, paid the rent, paid employees and taxes, dealt with trade vendors and answered to no one other than himself. (Warehouse Wines' Responsive 56.1 Statement ¶ 21.) However, the parties disagree as to which of the Ceseretti-controlled companies operated the warehouse. The distinction becomes important if one of the companies can be considered a carrier and the other cannot.

Travelers argues in its briefs that Bestway Warehouse & Transportation operated the warehouse and that the company's sole function was warehousing – and not in transportation. According to Travelers, this function means that the property was not in the custody of a carrier for hire. Warehouse Wines, however, creatively asserts that it was in fact the trucking company – Bestway Logistics

Transportation – that operated the warehouse. Bestway Logistics Transportation employed drivers, was registered with the US Department of Transportation and transported Warehouse Wines inventory for a fee. (McGill Decl., Ex. 3.) Its trucks were registered as of June 30, 2011 as a "common carrier" authorized "to engage in transportation by motor vehicle, in interstate or foreign commerce." (McGill Decl., Ex. 3, 7.) As Bestway Logistics Transportation was a common carrier, Warehouse Wines tries to connect that company's trucking role to Ceseretti's warehouse operation to show that the stolen goods were in the custody of a carrier for hire, even if they were stolen while sitting in a warehouse and not on a truck. Warehouse Wines explains that "because the operator of the storage facility was responsible for the custody of Warehouse Wines' inventory from the time of its storage until its delivery to the Plaintiff, it was operating as a carrier for hire." (Pl. Opp'n at 14.)

Warehouse Wines argues that – at the very least – there is a triable issue of fact as to the true operator of the warehouse created by Travelers' response to a Request for Admission that "[i]t is unclear which of James Ceseretti's companies operated the warehouse". (McGill Decl., Ex. 20 ¶ 42.) Warehouse Wines further points to Travelers' internal notes on the theft that describe the "warehouse operated by Best Way Logistics Transportation Inc" (McGill Decl, Ex. 19) and "a warehouse operated by Bestway logistics [sic]" (McGill Decl., Ex. 9), as well as a statement from a Travelers employee referring to the theft "from a warehouse operated by Best Way Logistics" (McGill Decl., Ex. 19.)

14

Warehouse Wines merely relies upon the use of confusingly similar names to create a triable issue where none exists. Any mistaken impression of Travelers as to who operated the warehouse is irrelevant to the determination of whether the company in custody of the property was in fact a carrier.[3] The only other fact Warehouse Wines relies on to show a genuine dispute as to the operator of the warehouse is that some storage invoices were issued on Bestway Logistics Transportation letterhead. (McGill Decl., Ex. 5.) Barbara Ceseretti issued some warehouse storage bills on the letterhead of Bestway Logistics Transportation, and some delivery bills on the letterhead of Bestway Warehouse & Transportation. (Sipple Decl. Ex. J and K.) However, deposition testimony makes clear that the two company names were transposed for some reason, likely a mistake.[4] At her deposition, Barbara Ceseretti affirmatively identified Bestway Warehouse & Transportation as the company that ran the warehouse.[5] James Ceseretti testified

---

[3] In addition, the instances cited by Warehouse Wines as examples of Travelers identifying Bestway Logistics Transportation as the company that operated the warehouse are taken out-of-context. In those examples, Travelers refers to the incorrect Bestway name after Steven Goldstein, President of Warehouse Wines, gave them the incorrect Bestway name when he was reporting the loss. One note from a Travelers adjuster, who was documenting his conversation with Goldstein on the day the loss was first reported, reads: "[Goldstein] stated they are a wine and liquor retailer and the loss involves cases of liquor that were at a public warehouse, Best Way Logistics Transportation, Inc." (McGill Decl., Ex. 19.) Warehouse Wines points to other Travelers documents which repeat the mistaken Bestway Logistics Transportation name provided to them by Goldstein. Such references to the incorrect Bestway name by Travelers employees without personal knowledge of which of the two Ceseretti companies operated the warehouse do not create a genuine dispute of fact as to the operator of the warehouse.

[4] It is little surprise that people might confuse the two similar names. In fact, after soliciting Warehouse Wines to be a customer of his new warehouse, on September 10, 2008, James Ceseretti memorialized the new business relationship on letterhead reading a third name: "Bestway Logistics Transportation & Warehousing". (Warehouse Wines Responsive 56.1 ¶ 4.) When asked about that third name, Barbara Ceseretti clarified, "I believe it is to read Bestway Warehouse Transportation, not Bestway –". (Sipple Decl., Ex. G at 51:19.)

[5] Barbara Ceseretti testified as follows on direct examination by Travelers:
   Q. And as you understood it, which company ran the warehouse?
   A. Bestway Warehouse and Transportation.

15

to the same.[6]  James Ceseretti issued checks on the account of Bestway Warehouse & Transportation to pay rent on the warehouse.  (Sipple Decl. Ex. D.)  Bestway Warehouse & Transportation is the company with the word "warehouse" in its name.  Indeed simple logic compels the conclusion that the company which owned all the trucks (Bestway Logistics Transportation) was responsible for transportation and the company which did not own the trucks (Bestway Warehouse & Transportation) was responsible for storage.  By arguing that the company with the trucks also ran the warehouse, Warehouse Wines is unable to account for Bestway Warehouse & Transportation's role in the corporate scheme.

---

        Q. Okay.  And was it – was one of the companies also running the trucking?
        A. The trucks were owned by Bestway Logistics.  The name on the title and registration was Bestway Logistics.
        Q. Okay.  So – so, as it – as you understood it, Bestway Warehouse and Transportation was running the warehouse and Bestway Logistics had the trucks?
        A. Correct.
(Sipple Decl., Ex. G at 30:16-31:9.)

        On cross-examination by Warehouse Wines, she further testified as follows:
        Q. Earlier we talked about the role of Bestway Logistics Transportation, and I believe – what was your take as to what the role of Bestway Logistics Transportation is?
        A. The only thing that Bestway Logistics did was supply Bestway Warehouse with trucking equipment.
        Q. And would it transport goods as well?
        A. The trucks did.  Yes.
(Sipple Decl., Ex. G at 47:23-48:13.)

[6] James Ceseretti testified as follows on direct examination by Travelers:
        Q. Okay.  Now, this document is on a letterhead of Bestway Logistics Transportation and Warehousing, Inc.  Is that the company that was operating the warehouse out in Hauppauge?
        A. No.
        Q. Okay. Which company was actually operating the Bestway Warehouse at 100 Marcus Boulevard in Hauppauge?
        A. Bestway Warehouse.
(Sipple Decl., Ex. C at 15:10-15:21.)

        Q. Okay.  Maybe I am confused and if it is, I apologize.  You had this company, Bestway Warehouse and Transportation, Inc., that was the entity.  It was operating the warehouse; correct?
        A. Bestway Warehouse and Transportation, correct.
(Sipple Decl., Ex. C at 31:11-31:19.)

16

Warehouse Wines suggests in its briefs that even if Bestway Warehouse & Transportation operated the warehouse, that entity too is a carrier for hire.  It looks to the federal code to show that, pursuant to 49 U.S.C. § 13102(3), the term "carrier" means "a motor carrier, a water carrier, and a freight forwarder."  It then goes on to say that the warehouse was a "freight forwarder" because, pursuant to 49 U.S.C. § 13102(8), the term "freight forwarder" means "a person holding itself out to the general public . . . to provide transportation of property for compensation . . ."  Finally, it points to 49 U.S.C. § 13102(23) to define "transportation" as including "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property."  Through this linking together of definitions, it argues that Bestway Warehouse & Transportation was a carrier because it had a role in certain "services related to that movement" of inventory stored at the warehouse.

Irrespective of the applicability of these definitions, Warehouse Wines' argument is far too removed from the reality of the indisputable facts.  Warehouse Wines' frequent amalgamation of the storage and transportation roles of Ceseretti's companies in its briefs do not reflect the reality of two companies which billed Warehouse Wines for two different functions.  After soliciting Warehouse Wines to be a customer of his new warehouse, Ceseretti drew up a letter on the letterhead of Bestway Logistics Transportation & Warehousing (see footnote 3 for the discussion on this third name) which read: "It is understood that Bestway Logistics

17

Transportation & Warehousing will be warehousing your merchandise at our facility located at 100 Marcus Boulevard, Hauppauge, NY 11788. For this service Bestway will be compensated at the agreed rate of <u>.15 per case, and a .10 in/out charge.</u>" (Sipple Decl., Ex. E.) In other words, the agreement between those parties was for warehousing. Furthermore, it was an agreement for indefinite storage – not short-term storage at a way station between transports. A warehouser is not typically a carrier. <u>See, e.g.</u>, <u>Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.</u>, 45 F.Supp.2d 288, 292 (S.D.N.Y. 1999) (distinguishing between a warehouseman and a common carrier by finding that the defendant did not convert from a common carrier to a warehouseman when it decided to suspend delivery and hold goods in storage incidental to carriage).

In addition, the fact that Ceseretti also transported goods for Warehouse Wines under another entity does not negate the undisputed fact that he stole the property when it was secured in his warehouse. The property must be "in the custody of a carrier for hire" at the time it is lost in order for the exception to apply. Determining who had custody necessarily includes a temporal element. At the time of the theft, the wine and liquor was in storage at the warehouse and was not in transit. Warehouse Wines argues that the insurance language does not limit the exclusion to property <u>transported</u> by a carrier for hire, but applies to property in the <u>custody</u> of a carrier for hire. (Pl. Opp'n at 18.) Thus, it argues that the exception is broader than the period of time the property is in transit. While true that the exception could apply to a carrier when goods are not in transport (e.g. when UPS is

18

processing a shipment in its store), it does not apply to a company whose job was to store goods.

There is no dispute of material fact that James Ceseretti operated the warehouse from which he stole over one million dollars of wine and liquor goods under the name Bestway Warehouse & Transportation. That entity, unlike Bestway Logistics Transportation, did not own trucks. It was responsible for warehousing the goods and cannot be construed to be a carrier for hire.

IV.   CONCLUSION

For the reasons set forth above, Travelers' motion for summary judgment is GRANTED and Warehouse Wines' motion for summary judgment is DENIED. Travelers' motion to amend is DENIED.

The Clerk of Court is directed to close the motions at ECF No. 46, 52, 75 and terminate this action.


SO ORDERED.

Dated:      New York, New York
            March 31, 2015

_____
KATHERINE B. FORREST
United States District Judge