UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

WAREHOUSE WINES & SPIRITS, INC.,      :
                                      :
                  Plaintiff,          :
                                      :
           -v-                        :
                                      :
TRAVELERS PROPERTY CASUALTY           :
COMPANY OF AMERICA,                   :
                                      :
                  Defendant.          :

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 16, 2015

13 Civ. 5712 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

James Ceseretti stole more than one million dollars' worth of wine and liquor from plaintiff Warehouse Wine & Spirits, Inc. ("Warehouse Wines").  He had the opportunity to do so because he provided Warehouse Wines with a number of services, including running the warehouse in which Warehouse Wines stored excess inventory.

Warehouse Wines insured its product with defendant Travelers Property Casualty Company of America ("Travelers").  But when Warehouse Wines submitted a claim for the loss Ceseretti had caused, Travelers denied the claim. The denial was based on, <u>inter alia</u>, the policy's "inventory" exclusion, which precludes coverage for a loss found upon taking inventory, and its "dishonest acts" exclusion, which precludes coverage where a loss is caused by the dishonest acts of a person "entrusted with the property."  However, the policy also contains an

exception to the "dishonest acts" exclusion[1] for property "in the custody of a carrier for hire."

Warehouse Wines brought suit for breach of contract against Travelers in New York State court, and Travelers removed the matter to this court on the basis of diversity jurisdiction. (ECF No. 1.) Three principal questions determine coverage in this case: (1) whether the loss was found upon taking inventory, (2) whether the property was stolen by someone to whom Warehouse Wines "entrusted" it, and (3) if it was, whether it was "in the custody of a carrier for hire" when it was stolen. As discussed below, the answer to the first question is "no," while the answer to the latter two questions is "yes." The loss was not found upon taking inventory, the property was stolen by one to whom it had been entrusted, and that person/entity was a carrier for hire. Plaintiff's motion for summary judgment is therefore GRANTED and defendant's is DENIED.

This is the Court's second opinion on summary judgment in this matter, and it reaches a conclusion opposite that of its now-vacated first summary judgment opinion. (ECF No. 93.) As discussed further below, the Court's first opinion improperly assumed that a business operating a warehouse could not be a carrier for hire. That was incorrect.[2] As a result of this mistake, the Court's first opinion failed to note that Warehouse Wines's formal storage relationship – at the outset and whenever invoiced – was with the only Bestway corporation that was

---

[1] One might call it an exclusion to the exclusion.
[2] The Court did not reach the "entrusted to" or "inventory exclusion" issues in that opinion.

unambiguously a carrier for hire.  Given the Court's error and the manifest injustice

which would have resulted without correction, reconsideration was proper.

I.    FACTUAL BACKGROUND

A.    <u>The Relationship Between Warehouse Wines and Ceseretti</u>

Warehouse Wines operates a wine and spirits retail store in Manhattan.

(Def.'s 56.1 ¶ 1.[3])  Steven Goldstein is the company's President, sole officer, and only

stockholder.  (<u>Id.</u>)  Warehouse Wines has more inventory than it can keep in its

Manhattan retail location, and it stores the excess inventory in outside warehouses.

(<u>Id.</u> ¶ 2.)  At his examination under oath,[4] Goldstein testified that in 2007

Warehouse Wines began using Bestway Logistics Transportation Inc. to provide

trucking services delivering products from the third-party warehouses storing

Warehouse Wines' inventory to the Manhattan retail store.  (ECF No. 48, Exh. 2,

85:5-16.)  According to Goldstein, this was the start of the relationship between

Warehouse Wines and James Ceseretti: an agreement that Ceseretti's company

Bestway Logistics Transportation would deliver Warehouse Wines' products.  (<u>Id.</u>)

As of June 30, 2011, Bestway Logistics Transportation was registered with the U.S.

---

[3] The notation "Def.'s 56.1" refers to the defendant's statement of undisputed material facts, submitted under Local Rule 56.1.  (ECF No. 55.)  The Opinion relies only on those facts the plaintiff did not dispute with citations to admissible evidence in its response. (ECF No. 66.)  <u>See</u> Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").
[4] An examination under oath is part of an insurer's claim investigation and is "designed to make available to the insurer additional information from which to determine whether the claim is a just one which should be paid."  <u>Couch on Insurance</u> § 196:3 (Steven Plitt et al., eds., 3d ed. 2015).

Department of Transportation as a carrier for hire in interstate commerce. (ECF No. 48, Exh. 3.)

Between September 2008 and January 2012 a significant portion of Warehouse Wines' inventory was stored in a building at 100 Marcus Boulevard, Hauppauge, New York. (Def.'s 56.1 ¶ 3.) The building is owned by the Haugland Group, LLC, an entity not otherwise involved in this matter. (ECF No. 54, Exh. D.) In April 2008 Haugland Group leased more than 16,000 square feet of the building to an entity identified on the lease as Citiwide Ltd. (Id.) James Ceseretti signed the lease on behalf of Citiwide. (Id.) The record does not contain any further evidence relating to Citiwide; there is no evidence in the record of any sublease agreement between it and any Bestway corporation for the warehousing space at 100 Marcus Boulevard. As of April 2008, the sole Bestway corporation in existence was Bestway Logistics Transportation; this was the same entity that had commenced providing delivery services to Warehouse Wines in 2007.

In April 2008, Ceseretti also applied to the State of New York for a permit to store and keep alcoholic beverages at 100 Marcus Boulevard, as required by N.Y. Alco. Bev. Cont. Law § 96 (McKinney 2002). (ECF No. 97, Exh. D.) The application reported that no "other business of any kind [would] be carried on in said premises." (Id.) Ceseretti submitted this application on behalf of Bestway Logistics Transportation Inc. (Id.), and the State issued the permit to Bestway Logistic[5] [sic] Transportation Inc. in September 2008. (Id., Exh. C.) Thus, in September 2008,

---

[5] Although the permit application included the 's' at the end of the 'Logistics,' the permit itself does not. (Compare ECF No. 97, Exh. D, with id., Exh. C.)

Bestway Logistics Transportation, a carrier for hire,[6] expanded its business to include warehouse operations and acquired legal permission to warehouse alcohol in particular.  In January 2009 Barbara Ceseretti applied for and received a two-year alcohol warehouse permit renewal for Bestway Logistic [sic] Transportation Inc.  (Id., Exh. D.)  There is no evidence in the record that any other Bestway or Ceseretti-related corporate entity ever applied for or received an alcohol storage permit from the State.

Around the same time Bestway Logistics Transportation received the permit to warehouse alcohol, Ceseretti solicited Goldstein to become a customer of his warehouse operation.  (Def.'s 56.1 ¶ 4.)  Goldstein accepted, and on September 10, 2008, Ceseretti confirmed the relationship in a letter written on the letterhead of Bestway Logistics Transportation & Warehousing.  (Id.)  In that letter, Ceseretti wrote:

> It is understood that Bestway Logistics Transportation & Warehousing will be warehousing your merchandise at our facility located at 100 Marcus Boulevard, Hauppauge, NY 11788.  For this service Bestway will be compensated at the agreed rate of .15 per case, and a .10 in/out charge.

(Id. (underlining removed).)  No company named Bestway Logistics Transportation & Warehousing ever existed as a formal corporate entity, (ECF No. 54, Exh. G, 50:20-51:12) nor is there any evidence in the record of any business in fact operating under this name at this time.  Rather, the only Bestway corporate entity that could have confirmed this agreement was Bestway Logistics Transportation – the

---

[6] As discussed below, an entity that delivers goods for a fee does not cease to be a carrier for hire if it also provides warehousing services.

company which already transported Warehouse Wines' products and had recently launched a warehousing operation.

From September 2008 through the discovery of Ceseretti's theft in late 2011 and early 2012, Warehouse Wines stored a portion of its excess inventory at the 100 Marcus Boulevard location.  (Def.'s 56.1 ¶ 2.)  Warehouse Wines would direct its suppliers to deliver certain inventory to the warehouse at 100 Marcus Boulevard, and the invoices from at least one supplier, Empire Merchants, listed Warehouse Wines as the "Name" of the customer and "Bestway Logistic Transporti" [sic] on the invoice's "DBA" line.  (ECF No. 54, Exh. H.)  In addition to storing the product, Ceseretti transported product from the warehouse to Warehouse Wines' retail store, making an average of eight deliveries per month.  (Pl.'s 56.1 ¶ 21.[7])

To complicate matters, for unknown reasons Ceseretti, or one of his family members, created a new corporate entity, Bestway Warehouse & Transportation Inc. in June 2009.  (ECF No. 97, Exh. A; ECF No. 58, Exh. 7, 188:8-190:14.)  The two Bestway entities (that is, Bestway Logistics Transportation and Bestway Warehouse & Transportation) shared a common bank account and failed to separate their financial records.  (Def.'s 56.1 ¶ 22.)  Ceseretti directed both companies, paid all employees, rent, and taxes, and otherwise handled all operations for the entities.  (Id. ¶ 21.)  Bestway Warehouse & Transportation never applied for or received a permit from New York State to store alcohol.

---

[7] The notation "Pl.'s 56.1" refers to the plaintiff's statement of undisputed material facts, submitted under Local Rule 56.1.  (ECF No. 50.)  The Opinion relies only on those facts the defendant did not dispute with citations to admissible evidence in its response. (ECF No. 64.) See note 2, supra.

As described above, only Bestway Logistics Transportation was licensed by the State to store alcohol.  Ceseretti's mother, Barbara, produced invoices charging Warehouse Wines for various services.  (Def.'s 56.1 ¶¶ 16, 19.)  She produced invoices for <u>storage services</u> on paper that bore the legend "Bestway Logistics Transportation" and invoices for <u>delivery services</u> on paper that bore the legend "Bestway Warehouse & Transportation." (<u>Id.</u> ¶¶ 19-20; ECF No. 54, Exhs. J, K.) But to further confuse things, at her deposition Barbara Ceseretti testified that Bestway Warehouse & Transportation ran the warehouse, while Bestway Logistics Transportation owned the trucks used for deliveries.  (ECF No. 54, Exh. G, 30:17-31:9.)  James Ceseretti similarly testified that Bestway Warehouse & Transportation operated the warehouse.  (<u>Id.</u>, Exh. C, 30:11-31:2.)  The record includes copies of rent checks that Ceseretti wrote in 2011 to 100 Marcus LLC – yet another entity, seemingly related to the Haugland Group – which identify the payor as "Bestway Warehouse & Trans Inc."  (ECF No. 54, Exh. D.)

During Goldstein's examination under oath he testified that he visited the 100 Marcus Boulevard location three times: once before he agreed to store his inventory there in September 2008, once in mid-2009, and a third time in January 2012, after he began to suspect some of his inventory might be missing.  (ECF No. 48, Exh. 2, 98:21-99:2.)  Neither Goldstein nor Warehouse Wines performed a full physical inventory of the wine and spirits it stored at 100 Marcus Boulevard prior to suspecting the theft.  (<u>Id.</u>, 149:11-14.)

B.      The Insurance Policy Travelers Sold Warehouse Wines

In October 2008 (that is, after Warehouse Wines had agreed to store its products with Bestway Logistics Transportation, and before the incorporation of Bestway Warehouse & Transportation) an agent of Travelers Insurance sought to sell an insurance contract to Warehouse Wines.  (ECF No. 48, Exh. 10, 32:24-33:8.) As part of this process, Rochelle Goldberg, an underwriter with Travelers, began to evaluate the risks surrounding Warehouse Wines.  (Id., 34:3-13.)  Travelers' employees inspected the three warehouses Warehouse Wines used to store its inventory.  (Id., 34:19-24.)  On March 12, 2009, Stephen Banks, a Senior Risk Control Consultant with Travelers, conducted a physical inspection of the 100 Marcus Boulevard warehouse to assess the risks to Warehouse Wines' products at that location.  (Id., Exh. 11.)  Notably, this inspection occurred several months prior to the creation of Bestway Warehouse & Transportation.  Thus, when Travelers inspected the premises, the sole corporate entity operating therein was Bestway Logistics Transportation.

Warehouse Wines and Travelers entered into a series of one-year insurance policies that insured Warehouse Wines against certain risks of direct physical loss of its property; the operative policy (the "Policy") was effective for the period from October 2011 to October 2012. (Pl.'s 56.1 ¶ 5.)  The Policy identified three warehouses on its "Location Schedule," one of which was located at 100 Marcus Boulevard.  (ECF No. 54, Exh. W, TP 7.)  Wine and spirits located at the 100

Marcus Boulevard location were the subject of $4,000,000 worth of "Property Floater Coverage."  (Id., TP 10.)   A separate provision of the contract provided $60,000 worth of "Transportation Coverage" for property when in transit by motor carrier.  (Id., TP 11.)

The provisions of the Policy's "Property Floater Coverage" and "Transportation Coverage" were set forth in separate sections of the Policy.  The "Property Floater Coverage" promised that Travelers would "pay for 'loss' to Covered Property from any of the Covered Causes of Loss."  (Id., TP 16, ¶ A.)  The Covered Causes of Loss were, in turn, defined as "risks of direct physical 'loss,'" subject to certain exclusions.  (Id., ¶ A.3.)  The exclusions relevant to this action are set forth below:

> 2.      We will not pay for a "loss" caused by or resulting from any of the following:
>
> …
>
> c.      Shortage found upon taking inventory.
>
> d.      Dishonest acts by you, anyone else with an interest in the property, your or their employees or authorized representatives <u>or anyone entrusted with the property</u>, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.
>
> This exclusion does not apply to property in the custody of a carrier for hire.

(Id., TP 17, ¶ B.2.c-d (emphasis added).)

The provisions of the "Transportation Coverage" resembled, but did not precisely mirror, the provisions of the "Property Floater Coverage."  It promised that Travelers would "pay for direct physical loss or damage to Covered Property

from any of the Covered Causes of Loss."  (<u>Id.</u>, TP 19, ¶ A.)  The Covered Causes of

Loss were, in turn, defined as "risk of direct physical loss or damage" subject to

certain exclusions.  (<u>Id.</u>, TP 20, ¶ A.4.)  The exclusions relevant to this action are set

forth below:

> 2.      We will not pay for loss or damage caused by or resulting from
> any of the following:
>
> …
>
> b.      Dishonest or criminal acts by you, anyone else with an interest
> in the property, your or their employees or authorized representatives,
> or anyone entrusted with the property, whether or not acting alone or
> in collusion with other persons or occurring during the hours of
> employment.
>
> This exclusion does not apply to:
>
> (1)      Property in the custody of a carrier for hire; or
>
> (2)      Acts of destruction by your employees.  But theft by employees is
> not covered.

(<u>Id.</u>, TP 22, ¶ B.2.b.)

The Policy did not define the terms "interest in the property," "entrusted with

the property," "custody," or "carrier for hire."

C.      <u>Warehouse Wines' Loss</u>

Starting at least as early as February 2011, Ceseretti failed to deliver

Captain Morgan rum that Warehouse Wines had ordered from the warehouse and

which Warehouse Wines' records indicated Ceseretti should have had in stock.

(Def.'s 56.1 ¶ 24.)  By December 2011 the shortages were more severe, as Ceseretti

failed to deliver Belvedere vodka, Jack Daniels whiskey, or Johnny Walker Black

scotch, all of which Warehouse Wines' records indicated should have been on hand

in the 100 Marcus Boulevard warehouse.  (Id. ¶¶ 27-28.)  After a December 26, 2011 order for 591 cases was short 53 cases, Goldstein sent Ceseretti an email about the shortages.  (Id. ¶ 29.)

The next day, December 27, 2011, Goldstein received a telephone call from Mitch Herman, the President of Bottle Bargains, the other company that stored wine and spirits with Ceseretti in the 100 Marcus Boulevard warehouse.  (Id. ¶ 30; Pl.'s 56.1 ¶ 24-25.)  Several days earlier, Herman had received a letter from Bestway's attorneys informing him that Bestway would no longer deliver certain products Bottle Bargains had stored with it, including Grey Goose vodka, Smirnoff vodka, and two kinds of wine.  (Def.'s 56.1 ¶ 32.)  He then visited the warehouse to conduct an inventory that revealed that roughly 4,700 of the more than 9,000 cases his company had stored with Bestway were missing.  (Id. ¶ 34.)  After learning this, Herman placed the call to inform Goldstein that he believed Warehouse Wines' inventory might be in "jeopardy" of having been stolen.  (Pl.'s 56.1 ¶ 24.)

Goldstein called Ceseretti and told him they needed to talk.  (Def.'s 56.1 ¶ 35.)  When the men spoke at Warehouse Wines' retail store on December 28, Ceseretti told Goldstein that several categories of products, including Jack Daniels cases and Johnny Walker Black cases, were not at Bestway's warehouse.  (Id. ¶ 36.)

On January 3, 2012, Goldstein inspected the 100 Marcus Boulevard warehouse and discovered a shortage of approximately 4,000 cases.  (Id. ¶ 37.)  He calculated the shortage by comparing what was on hand with the quantity that Warehouse Wines' "Inventory Transaction Flow" suggested should be available.

(See ECF No. 63, Exh. Y.)  Goldstein could not find any of the 636 cases of liter bottles of Grey Goose vodka, 319 cases of 750 ml bottles of Veuve Clicquot champagne, 206 cases of liter bottles of Ketel One vodka, or 140 cases of liter bottles of Cuervo Gold tequila.  (Def.'s 56.1 ¶ 38.)  Other items were missing as well, including four of the 51 cases of 1.75 liter bottles of Bushmills Irish Whiskey that Warehouse Wines' records indicated should have been present were unaccounted for, 25 of the 200 cases of 750 ml bottles of Oban Distillers Edition scotch, 126 of the 276 cases of 1.75 liter bottles of Russian Standard vodka, and 162 of the 164 cases of bottles of Sterling Vintner's Collection cabernet sauvignon.  (ECF No. 63, Exh. Y.)

Warehouse Wines removed its remaining inventory from the 100 Marcus Boulevard warehouse later in January 2012.  (Pl.'s 56.1 ¶ 33.)

On May 23, 2013, James Ceseretti was arrested and charged with the theft of property belonging to Herman and Warehouse Wines.  (Def.'s 56.1 ¶ 42.)  Ceseretti and both corporate entities, Bestway Logistics Transportation and Bestway Warehouse & Transportation, were subsequently indicted for First Degree Grand Larceny.  (Id.)

On January 9, 2015, Ceseretti pled guilty to stealing more than $1,000,000 from Goldstein.  (ECF No. 90, Exh. 1.)  The indictments against both Bestway entities were dismissed as being "covered by [Ceseretti's] plea."  (Id.)

D.    This Litigation

Within two days of the January 3, 2012 inventory of the 100 Marcus Boulevard warehouse, Warehouse Wines submitted a claim for its loss to Travelers.

(Pl.'s 56.1 ¶ 32.)  Travelers began an investigation.  (Id. ¶ 34.)  On April 24, 2012, Warehouse Wines filed a Proof of Loss for $1,177,788.  (ECF No. 48, Exh. 29.)

On August 6, 2013, Travelers declined coverage.  (Pl.'s 56.1 ¶ 48.)  Travelers asserted that the loss fell within several Policy exclusions, including the exclusion of shortages found upon taking inventory and the dishonest acts exclusion.  (ECF No. 48, Exh. 26.)  Travelers also faulted Warehouse Wines' valuation method, which Travelers described as depending on January 2012 prices and overstating Warehouse Wines' loss.  (Id.)

On July 23, 2013, Warehouse Wines filed this action in the Supreme Court of the State of New York.  On August 15, 2013, Travelers removed the action to this court.  (ECF No. 1.)

Both parties moved for summary judgment.  (ECF Nos. 46, 52.)  The Court initially granted Travelers' motion for summary judgment because it concluded that "the property was simply not in the custody of a carrier for hire when stolen from the warehouse," and thus that the exception to the exclusion in the Policy did not apply.  (ECF No. 93.)  The Court did not reach the "inventory" exclusion or discuss how the concepts of property being "entrusted to" an entity and "in the custody of" an entity related to one another.

Warehouse Wines moved for reconsideration.  (ECF No. 95.)  The Court granted Warehouse Wines' motion because Warehouse Wine had "raised a series of issues which, if correct, would indicate a manifestly unjust result."  (ECF No. 107.)

The Court therefore vacated its prior decision and reconsidered the parties'
arguments for summary judgment de novo.  (Id.)

II.    LEGAL PRINCIPLES

    A.    <u>Summary Judgment Standard</u>

Summary judgment may not be granted unless a movant shows, based on
admissible evidence in the record, "that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of
a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).
On summary judgment, the Court must "construe all evidence in the light most
favorable to the nonmoving party, drawing all inferences and resolving all
ambiguities in its favor."  <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving
party's claims cannot be sustained, the opposing party must set out specific facts
showing a genuine issue of material fact for trial.  <u>Price v. Cushman & Wakefield,
Inc.</u>, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); <u>see also</u> <u>Wright v. Goord</u>, 554 F.3d
255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture
as to the true nature of the facts to overcome a motion for summary judgment,"
because "[m]ere conclusory allegations or denials . . . cannot by themselves create a
genuine issue of material fact where none would otherwise exist."  <u>Hicks v. Baines</u>,
593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); <u>see also</u> <u>Price</u>, 808 F. Supp. 2d
at 685 ("In seeking to show that there is a genuine issue of material fact for trial,

the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

B.     Interpretation of Insurance Contracts

"Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'"  Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (quoting K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)).  "The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is

that the intentions of the parties should control." SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986)).  "[T]he meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (quoting Newmont Mines, 784 F.2d at 135).

The first inquiry for the Court "is whether the contract is unambiguous with respect to the question disputed by the parties." Int'l Multifoods, 309 F.3d at 83. Ambiguity is measured from the perspective of a reasonably intelligent person familiar with the contract and the customs and practices of the trade.  Id.  If a contract is unambiguous, the Court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." Id. (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998)).  If a contract provision is ambiguous, however, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Id. (quoting Morgan Stanley Grp. Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000)).

"Under New York law, 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'"

Morgan Stanley, 225 F.3d at 275 (quoting Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995)).  When a court is required to interpret an insurance contract, one of the rules of contract construction it applies is "the rule of contra proferentem, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] ... policy should be resolved in favor of the insured.'"  Id. at 276 (alteration and omission in original) (quoting McCostis v. Home Ins. Co. of Ind., 31 F.3d 110, 113 (2d Cir. 1994)).  Courts applying New York law "have consistently construed ambiguous policy provisions in favor of coverage and against the insurer who drafted the policy."  City of New York v. Evanston Ins. Co., 830 N.Y.S.2d 299, 302 (N.Y. App. Div. 2007) (quoting Primavera v. Rose & Kiernan, Inc., 670 N.Y.S.2d 223, 225 (N.Y. App. Div. 1998)).  "Indeed, 'in order for the insurer to prevail, it must demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation.'"  Id. (quoting Primavera, 670 N.Y.S.2d at 225).

In cases involving "all-risk" insurance coverage, New York law establishes a burden-shifting scheme.  First, the insured must establish "a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property."  Int'l Multifoods, 309 F.3d at 83 (quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co., 178 F. Supp. 2d 346, 351 (S.D.N.Y. 2001)).  "The burden on the insured with respect to demonstrating a fortuitous loss under an 'all-risks' policy . . . is relatively light."  Id.

Once the insured has made a prima facie case for recovery, the insurer then bears the burden to prove that the claimed loss falls within a policy exclusion. See Seaboard Sur. Co. v. Gillette Co., 476 N.E.2d 272, 311 (N.Y. 1984). "[E]xclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co., 908 N.E.2d 875, 877 (N.Y. 2009) (quoting Seaboard, 476 N.E.2d at 311). New York law will only enforce policy exclusions that "have a definite and precise meaning, unattended by danger of misconception ... and concerning which there is no reasonable basis for a difference of opinion." Id. (omission in original) (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)).

"[O]nce an insurer establishes that an exclusion applies, 'the burden shifts to the insured to demonstrate' that an exception to the exclusion applies." Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012) (quoting Northville Indus. Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, 679 N.E.2d 1044, 1048 (N.Y. 1997)).

III.    DISCUSSION

The parties do not dispute that Warehouse Wines has carried its initial burden of proving the existence of the Policy, it insurable interest in the property, and that the property has been lost. To raise a triable issue as to coverage or to obtain a ruling of no coverage on summary judgment, Travelers must demonstrate an applicable exclusion. It has raised two: the inventory exclusion and the

18

dishonest acts exclusion.  Warehouse Wines argues that the inventory exclusion does not apply and that the facts of this case fit its loss within the carrier for hire exception to the dishonest acts exclusion.

A.    The Inventory Exclusion

Section B.2.c of the Policy's Property Floater Coverage provides that Travelers "will not pay for a 'loss' caused by or resulting from . . . [s]hortage found upon taking inventory."  (ECF No. 54, Exh. W, TP 17.)  Travelers argues that this provision operates to exclude Warehouse Wines' loss from coverage.  (ECF No. 62, pp. 17-21.)  Warehouse Wines disagrees.  (ECF No. 47, pp. 18-20; ECF No. 71, pp. 7-9.)  The parties have briefed the New York Court of Appeals' analyses of inventory-related exclusions to insurance contracts in Ace Wire & Cable Co. v. Aetna Casualty & Surety Co., 457 N.E.2d 761 (N.Y. 1983), and New York University v. Continental Insurance Co., 662 N.E.2d 763 (N.Y. 1995).

Ace Wire and NYU are, however, neither directly on point nor dispositive.  In both cases, the insured specifically purchased coverage for losses caused by an employee's dishonest or criminal acts.  See NYU, 662 N.E.2d at 771; Ace Wire, 457 N.E.2d at 763.  In Ace Wire this dishonest act coverage contained an exclusion for "loss . . . the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation."  457 N.E.2d at 763.  After the trial court dismissed the insured's claim for coverage the Appellate Division, Second Department, reversed because the claim was "not dependent upon either an 'inventory computation' or a 'profit and loss computation,'" but instead was based on the personal knowledge of the insured's

corporate secretary that certain items were missing and had not been sold.  454
N.Y.S. 2d 897, 899 (App. Div. 1982).  The New York Court of Appeals agreed with
the Appellate Division and "h[e]ld that the phrase 'inventory computation' is to be
construed to proscribe proof of the fact or amount of loss through a generalized
estimate … of what the dollar value of inventory on hand should be[, but not to]
preclude proof of the fact or amount of loss through inventory records (whether
perpetual or periodically made) detailing the actual physical count of individually
identifiable units."  457 N.E.2d at 764-65.  Thus, the loss in Ace Wire fell outside
the particular inventory exclusion there at issue.

     The policy in NYU contained a similar exclusion to its dishonest acts
coverage, which barred recovery for "loss . . . the proof of which as to its existence or
amount is dependent upon (1) An inventory computation; or (2) A profit and loss
computation."  NYU, 662 N.E.2d at 771.  The Court of Appeals noted that the
reason insurers seek inventory exclusions to dishonest acts coverage was "to protect
themselves against 'claims based on erroneous or falsified inventory or profit and
loss computations … [and because] [i]nventory records and other business records
are less reliable than other evidence in proving that a loss of goods has been
sustained or that a loss is attributable to employee dishonesty.'"  Id. (alterations
and omissions in original) (quoting Dunlop Tire & Rubber Corp. v. Fidelity &
Deposit Co. of Md., 479 F.2d 1243, 1246 (2d Cir. 1973)).  The trial court had struck
the insurer's inventory exclusion defense in its entirety, and while the Court of
Appeals agreed that the insured's presentation of its employee's false documents

"would establish the <u>existence</u> of the loss by proof other than by estimation of an inventory shortage," it did not agree that the insured had established that the <u>amount</u> of its losses could be proven other than "by estimation of the loss by calculating pre- and posttheft dollar value of the inventory." <u>Id.</u> at 772, 771.  It therefore reinstated the defense.  <u>Id.</u> at 772.

The matter before the Court is significantly different from both of those cases.  First, the inventory exclusion in the instant Policy is aimed at different concerns; it is plainly not an exception to insurance specifically purchased <u>to cover</u> an employee's dishonest acts.  Second, and relatedly, the language of the provision is not materially similar to the language in the <u>Ace Wire</u> and <u>NYU</u> exclusions.  Here, section B.2.c of the Property Floater Coverage in the instant contract excludes from coverage "Shortage <u>found</u> upon taking inventory."  (ECF No. 54, Exh. W, TP 17 (emphasis added).)  Unlike the exclusions at issue in <u>Ace Wire</u> and <u>NYU</u>, section B.2.c relates to the <u>method of discovery</u> of a loss, not how the fact or amount of that loss would be proven.

The method of discovery in this matter, as discussed above, began with Goldstein's first-hand observation of receipt of a significantly incomplete delivery, followed by a telephone call from Herman informing Goldstein that Warehouse Wines' inventory might be in "jeopardy" of having been stolen.  (Pl.'s 56.1 ¶ 24.)  Thereafter, Goldstein visited the 100 Marcus Boulevard warehouse and personally observed the status of his products.  That an inventory was then conducted cannot pull the loss within the inventory exclusion.  To read the policy in such a way would

21

both conflict with the plain text of the exclusion and nonsensically suggest that after a loss was discovered by any method whatsoever an inventory could never be conducted or used as part of the claim lest an insured lose coverage.  As discussed above, exclusions from coverage in insurance contracts "are to be accorded a strict and narrow construction."  Pioneer Tower, 908 N.E.2d at 887 (quoting Seaboard Sur. Co., 476 N.E.2d at 311); see also id. ("Whenever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language." (quoting Seaboard Sur. Co., 476 N.E.2d at 311)).  An exclusion of "Shortage found upon taking inventory" (emphasis added) will not be read to exclude coverage for losses discerned through other means and confirmed by means of an inventory.  Travelers has not raised a triable issue of fact as to the inventory exclusion.

        B.    <u>The Custody of a Carrier for Hire Exception to the Dishonest Acts Exclusion</u>

There is no dispute that the loss was the result of a dishonest act by a person or entity.  Assuming it was entrusted to that person or entity (dealt with below), the question for the Court is therefore whether the exception to the exclusion for property in the custody of a carrier for hire applies; on this question, Warehouse Wines bears the burden of proof.  See Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012) (quoting Northville Indus. Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, 679 N.E.2d 1044, 1048 (N.Y. 1997)).

There is no triable issue of fact as to whether the stolen property was in the custody of a carrier for hire.  The text and structure of the Policy, as well as the

undisputed facts surrounding James Ceseretti and his Bestway corporations, compel this conclusion.

The exception refers to "property in the custody of a carrier for hire."  The interpretive question is whether this phrase should be understood to refer to a person or entity who <u>is</u> a carrier for hire or, instead, a person or entity who <u>is</u> <u>performing</u> carriage-specific services at the time of the loss.  In other words, is being a carrier for hire an identity or an activity?

Travelers strongly urges the latter interpretation.  It argues that reading the exception to refer to a permanent "carrier for hire" identity not tied to the services being provided at a given moment would be "absurd," as it would bring within the exception a warehouseman who only provided carrier for hire services to different clients in a far-off state.  (ECF No. 62, pp. 12-13; ECF No. 53, p. 25.)

But Travelers also cites Black's Law Dictionary for its definition of "carrier," "[a]n individual or organization (such as a shipowner, a railroad, or an airline) that contracts to transport passengers or goods for a fee."  (ECF No. 53, p. 25.)  This definition suggests that being a carrier is an identity: if one "contracts to transport passengers or goods for a fee," one is a carrier.  Neither Black's Law Dictionary nor the terms of the Policy suggest that determining whether an entity is a carrier for hire requires a moment-by-moment analysis of what particular activity is ongoing at the time.

Other terms in the Policy provide additional support for Warehouse Wines' preferred "carrier as identity" interpretation.  When the parties sought to limit

23

coverage to certain activities, they did so.  For example, the Policy generally excluded loss caused by water from coverage.  It also, however, provided that the water exclusion "does not apply to property in transit."  (ECF No. 54, Exh. W, TP 17 (emphasis added).)  Thus, the exclusions section of the Policy separately, and in close proximity, refers to property "in the custody of a carrier for hire" and property "in transit."  This formulation, like the existence of the Transportation Policy Coverage, demonstrates the insurer's intent to provide different coverage to goods "in transit."  Travelers clearly knew how to, and in fact at times did, distinguish the coverage it provided for property in transit from the coverage it otherwise provided, which runs counter to a reading of the phrases "in transit" and "in the custody of a carrier for hire" as synonymous.[8]

In light of the text and structure of the Policy, the exclusion carve-out for property "in the custody of a carrier for hire" is best read to refer to property held by an individual or entity in the business of transporting goods for a fee.  The phrase does not exclude goods that the carrier for hire stores for a period of time.  The phrase is, at most, ambiguous, and thus "must be interpreted in favor of the insured."  Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995).  If Travelers sought to limit the exception to its coverage exclusion to property on its way to being delivered, it was incumbent on it to do so by clear, unmistakable language.  See Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691,

---

[8] For example, the penultimate line of Travelers' memorandum of law in support of its motion for summary judgment argues that "[a]t the time of the loss, the goods were not in transit and there exists no support for the proposition that a single entity cannot act at one time as a warehouseman and at another time, and for another purpose, as a carrier for hire." (ECF No. 53, p. 25.)

697-98 (2d Cir. 1998) ("The reasonable expectations doctrine is a corollary to the contra-insurer or contra-proferentem rule. . . .  This rule gains added force when ambiguities are found in an exclusionary clause.").

The interpretation of the carrier for hire exception does not entirely dispose of the issue here; Warehouse Wines still bears the burden of proving that the exception applied, that is, of proving that the property was in the custody of a carrier for hire when it was stolen by someone to whom it had been entrusted.  This question is more complex, but is ultimately resolved by Travelers' own statement that "every aspect of the operation of both the warehouse company and the trucking company lead to the conclusion that both companies were mere instrumentalities and the alter egos of James Ceseretti."  (ECF No. 53, p. 18.)

As discussed above, determining whether Bestway Logistics Transportation or Bestway Warehouse & Transportation had "custody" over Warehouse Wines' inventory would require resolving questions of fact, which the Court cannot do on summary judgment.[9]  The bulk of the evidence supports Warehouse Wines' view that the goods were in the custody Bestway Logistics Transportation: it was the only Bestway company licensed by New York to store alcohol (ECF No. 97, Exh. D); it was the only Bestway company in existence when Ceseretti first began storing Warehouse Wines' products (Id., Exh. A); it was the only Bestway company in existence when Travelers inspected the 100 Marcus Boulevard warehouse (ECF No.

---

[9] If both Bestway corporate entities were carriers for hire, the Court would not need to resolve which one had custody over the product to resolve this motion.  But while it is clear that Bestway Logistics Transportation was a carrier for hire, there is no evidence that Bestway Warehouse & Transportation, considered alone, was.

48, Exh. 11); its name appeared on the storage invoices Barbara Ceseretti sent to Warehouse Wines (Def.'s 56.1 ¶ 19); and its name appeared on Warehouse Wines' suppliers' delivery invoices (ECF No. 54, Exh. H). But other evidence supports Travelers' view that the goods were in the custody of Bestway Warehouse & Transportation: both Barbara and James Ceseretti testified at their depositions that that entity operated the 100 Marcus Boulevard warehouse (ECF No. 54, Exh. G, 30:17-31:9; id., Exh. C, 30:11-31:2); and its name was on the rent checks Ceseretti wrote to the Haugland Group in 2011 (Id., Exh. D).

Although the Court generally cannot resolve the factual dispute described above on summary judgment, it can here. Travelers has conceded that "both companies were mere instrumentalities and the alter egos of James Ceseretti." (ECF No. 53, p. 18.) Travelers may be held to this admission, eliminating any triable issue on this point. See Donovan v. Carls Drug Co., 703 F.2d 650, 651-52 (2d Cir. 1983) (admissions can be used on summary judgment); Fed. R. Civ. P. 56(c)(1)(A) (listing "admissions" as one of several types of material available on summary judgment to support the proposition that a fact cannot be or is genuinely disputed). Indeed, the entire record supports Travelers' view. Ceseretti expanded his operations to provide warehouse services before he created a second Bestway corporate entity. The two Bestway corporations shared a common bank account, which James Ceseretti also used in lieu of maintaining a personal bank account. (Def.'s 56.1 ¶ 22.) Ceseretti made all decisions for both companies (Id. ¶ 21) and, as Travelers stated, "exercised complete dominion and control over the two

companies." (ECF No. 53, p. 17.) There is no evidence that the warehousing agreement that Ceseretti and Goldstein entered into at a time when only Bestway Logistics Transportation existed was ever replaced, superseded, or transferred from that corporation to Bestway Warehouse & Transportation. Indeed, there is no contemporaneous evidence that Warehouse Wines, Travelers, or any other observer could have used to distinguish between the responsibilities of the two corporations.

It would of course be illogical to argue that Warehouse Wines "entrusted its property to James Ceseretti, and not to some faceless corporation" (Id., p. 19) and that "only one person [is] responsible for the disappearance of property from the Bestway Warehouse – James Ceseretti," (Id., p. 17) and then turn around and insist that the inventory was specifically and solely in Bestway Warehouse & Transportation's custody when Ceseretti stole it. The Policy, including the carrier for hire exception to the dishonest acts exclusion, is to be interpreted according to "the 'reasonable expectation and purpose of the ordinary businessman.'" Stoney Run Co. v. Prudential-LMI Commercial Ins. Co., 47 F.3d 34, 37 (2d Cir. 1995) (quoting Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co., 457 N.E.2d 761, 764 (N.Y. 1983)). By that rule, an insured who makes an agreement with a carrier for hire for storage services cannot be held to lose insurance coverage because that carrier silently decides that one of his "alter egos" rather than the other is in charge of warehousing. James Ceseretti was entrusted with the products, James Ceseretti had custody of the products, and James Ceseretti stole the products. Because James Ceseretti contracted to transport goods for a fee he was a carrier for hire.

Both the "Dishonest Acts" coverage exclusion and the "carrier for hire" exception-to-the-exclusion apply, and the Policy therefore requires Travelers to cover Warehouse Wines' loss from Ceseretti's theft.

C.    Damages

Travelers argues that Warehouse Wines' calculation of damages is too speculative to support an award.  (ECF No. 62, pp. 17-24.)  Travelers criticizes Warehouse Wines' method of valuing the claim in three respects: first, that Warehouse Wines' inventory records are unreliable; second, that Warehouse Wines inappropriately presumes that every case it calculates to be missing was stolen, rather than lost in an unexplained manner; and third, that Warehouse Wines inappropriately used prices from January 2012 to establish its losses, rather than earlier, lower prices.

However, in order to defeat Warehouse Wines' motion for damages on summary judgment, Travelers "must set forth specific facts indicating a genuine issue for trial exists in order to avoid the granting of summary judgment."  Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  Specifically, Travelers "may not rest on the pleadings [or mere argument] but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial."  Id.

Travelers' efforts to cast doubt on the reliability of Warehouse Wines' inventory records amount to no more than "mere conclusory allegations, speculation or conjecture," which are insufficient to raise a question of material fact.  Id.

Travelers speculates that Ceseretti may not have stolen all of the inventory Warehouse Wines claims because while certain products were missing in their entirety others were missing in less dramatic form.  This is both an exercise in speculation and an oversimplification of the evidence, which indicates that some products were stolen in significant quantities but not in their entirety.  (See ECF No. 63, Exh. Y.)

Furthermore, Travelers' arguments as to the accuracy of Warehouse Wines' records run counter to its own accountant's report.  As part of its investigation, Travelers produced a report by Kenneth Altman, a CPA Travelers retained to analyze Warehouse Wines' loss.  (ECF No. 48, Exh. 23, 14:21-22.)  Altman tested Warehouse Wines' calculation of its loss and reported that "the testing substantiated the accuracy of [Warehouse Wines'] records and pricing."  (Id., Exh. 24, TC 2048.)  His report also detailed the fact that both Warehouse Wines and Bestway kept perpetual inventory records of the goods that were stored in the 100 Marcus Boulevard warehouse, and that those records only differed by 36 cases on a total inventory of more than 37,000 cases, a "statistically insignificant" difference that indicates "substantial agreement" between two sets of records.  (Id., TC 2050.)

In light of the admissible evidence of the amount of loss that Warehouse Wines has produced, Travelers was required to do more than raise theoretical questions about the accuracy of record keeping to resist summary judgment.  Warehouse Wines has carried its burden on this motion and is entitled to summary judgment on damages as well as liability.

IV.     CONCLUSION

For the reasons set forth above, Warehouse Wines' motion for summary judgment is GRANTED and Travelers' motion for summary judgment is DENIED. The parties shall confer on an appropriate form of judgment and submit one to the Court within 14 days of the date of this Opinion.

The Clerk of Court is directed to terminate this action.


SO ORDERED.

Dated:      New York, New York
            October 16, 2015

_____
            KATHERINE B. FORREST
            United States District Judge