UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 14, 2016
```

------------------------------------------------------------X

WAREHOUSE WINES & SPIRITS, INC.,        :
                                        :
                    Plaintiff,          :
                                        :        13 Civ. 5712 (KBF)
                                        :
          -v-                           :
                                        :        OPINION & ORDER
                                        :        AFTER TRIAL
TRAVELERS PROPERTY CASUALTY             :
COMPANY OF AMERICA,                     :
                                        :
                    Defendant.          :

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Plaintiff Warehouse Wines & Spirits, Inc. ("Warehouse Wines") brought this action against its insurer, defendant Travelers Property Casualty Company of America ("Travelers"), to recover amounts payable under an insurance policy. After the Court determined on summary judgment that Travelers was required to cover Warehouse Wines' loss, the parties went to trial on damages. The bench trial on this sole remaining issue was held on April 27 and 28, 2016. As a result of the facts proven at that trial, and for the reasons further discussed below, the Court hereby grants judgment in favor of Warehouse Wines in the amount of $808,341 plus applicable interest.

I.      BACKGROUND[1]

        A.      Undisputed Background Information

        Warehouse Wines operates a wine and spirits retail store in Manhattan.

Steven Goldstein is the company's President, sole officer, and only stockholder.

---

[1] Except where otherwise noted, the information contained in this section is derived from the undisputed facts in the Court's October 16, 2015 opinion granting summary judgment to Warehouse Wines. (ECF No. 114.)

Warehouse Wines has more inventory than it can keep in its Manhattan retail location, and it stores the excess inventory in outside warehouses.

Beginning in 2007, Warehouse Wines contracted with a company named Bestway[2] to provide trucking services between outside warehouses and the Manhattan retail store.  Bestway was run by a man named James Ceseretti.  In April 2008, Bestway began to offer warehousing services, and in September 2008 Warehouse Wines entered into an agreement to store some of its excess inventory with Bestway.

In October 2008, an agent for Travelers sought to sell an insurance contract to Warehouse Wines.  Travelers employees evaluated the risks surrounding Warehouse Wines, including the three third-party warehouses in which the company stored its inventory.  Warehouse Wines and Travelers then entered into a series of one-year insurance policies that insured Warehouse Wines against certain risks of direct physical loss of its property; the operative policy (the "Policy") was effective for the period from October 2011 to October 2012.

Under the terms of the Policy, wine and spirits stored at the Bestway warehouse were the subject of $4,000,000 worth of "Property Floater Coverage." That coverage promised that Travelers would "pay for 'loss' to Covered Property

---

[2] As discussed in the Court's summary judgment opinion, Ceseretti controlled and did business in the name of a number of different Bestway-related enterprises.  (ECF No. 114 at 3-7.)  In that opinion, the Court concluded that for purposes of policy coverage, the various companies "were mere instrumentalities and the alter egos of James Ceseretti."  (Id. at 26, quoting Travelers' Memorandum of Law in Support of its Motion for Summary Judgment.)  Accordingly, in this opinion the Court will refer to Bestway as a single entity.

from any of the Covered Causes of Loss," which were further defined as "risks of direct physical 'loss,'" subject to certain exclusions which do not apply to this case.

Starting at least as early as February 2011, Ceseretti failed to deliver Captain Morgan rum that Warehouse Wines had ordered from the warehouse and which Warehouse Wines' records indicated Ceseretti should have had in stock.  By December 2011 the shortages were more severe, as Ceseretti failed to deliver Belvedere vodka, Jack Daniels whiskey, or Johnny Walker Black scotch, all of which Warehouse Wines' records indicated should have been on hand in the 100 Marcus Boulevard warehouse.  After a December 26, 2011 order for 591 cases was short 53 cases, Goldstein sent Ceseretti an email about the shortages.

The next day, December 27, 2011, Goldstein received a call from the president of another company that stored wine and spirits with Bestway.  Goldstein learned that Bestway's attorneys had sent the other company a letter stating that Bestway could no longer deliver certain stored products, and that the president of the other company had subsequently conducted an inventory at the warehouse that revealed significant losses.

Goldstein called Ceseretti, and the two men spoke at Warehouse Wines' retail store on December 28, 2011.  Ceseretti told Goldstein that several categories of products, including Jack Daniels cases and Johnny Walker Black cases, were not at Bestway's warehouse.

On January 3, 2011, Goldstein visited the Bestway warehouse and conducted a partial inventory.  He discovered a shortage he calculated as approximately 4,000

cases.  Later in January, Warehouse Wines removed all of its remaining inventory out of the Bestway warehouse and into a warehouse known as Beehive; until that final removal, Warehouse Wines continued to place orders with Bestway to have some of its inventory delivered to the Manhattan retail location.  (Trial Tr. Goldstein[3] 264:11-12.)

On May 23, 2013, Ceseretti was arrested and charged with the theft of property belonging to Warehouse Wines and the other company for whom he provided warehousing services.  Ceseretti and Bestway were subsequently indicted for First Degree Grand Larceny.  On January 9, 2015, Ceseretti pled guilty to stealing more than one million dollars from Goldstein.  As discussed further below in the Court's findings of fact, Ceseretti also agreed to a restitution judgment in excess of one million dollars and has made some restitution payments to Warehouse Wines.

B.    The Claim

On January 5, 2012, Warehouse Wines submitted a claim for its loss to Travelers.  Travelers began an investigation.  On April 24, 2012, Warehouse Wines filed a Proof of Loss for $1,177,788.  Travelers requested that Warehouse Wines make its books and records available to a forensic financial accountant it had hired

---

[3] The notation "Trial Tr. [Witness Name]" refers to the transcript of the bench trial held on April 27-28, 2016.  The transcripts are available on the docket as ECF Nos. 193 (4/27/16, transcript pages 1-215) and 195 (4/28/16, transcript pages 216-430).

named Kenneth Altman.  Altman prepared a report dated March 13, 2012. (Goldstein Am. Decl.[4] ¶ 52.)

On August 6, 2013, Travelers issued a letter declining coverage.  Travelers asserted that the loss fell within several Policy exclusions, including the exclusion of shortages found upon taking inventory and the dishonest acts exclusion.  Travelers also faulted Warehouse Wines' valuation method, which Travelers described as depending on January 2012 prices and overstating Warehouse Wines' loss.

C.     Litigation History

On July 23, 2013, Warehouse Wines filed this action in the Supreme Court of the State of New York.  Travelers removed the action to this Court on August 15, 2013.  Both parties moved for summary judgment.

On March 31, 2015, the Court issued its first summary judgment opinion, granting judgment to Travelers on the basis that Warehouse Wines' loss had fallen within a coverage exclusion.

Warehouse Wines moved for reconsideration, and on May 11, 2015, the Court granted that motion and thereby vacated its prior opinion and considered the parties' arguments on summary judgment anew, including through oral argument on May 27, 2015.

---

[4] The Amended Initial Written Declaration of Steven Goldstein is available as ECF No. 179, Exh. 10. Travelers objected to certain statements in Goldstein's trial declaration.  (ECF No. 179, Exh. 9.)  The Court has considered Travelers' objections both as a whole and to the statements cited in this opinion.  (Goldstein Am. Decl. ¶¶ 23-24, 44, 52, & 57.)  The Court only considers the portions of these statements as to which Goldstein was competent to testify based on personal knowledge, and deems these statements admissible and relevant to the facts to be found in this matter.

On October 16, 2015, the Court issued its second summary judgment opinion, granting judgment to Warehouse Wines on the basis that neither of the two coverage exclusions Travelers had invoked actually applied.  The Court further determined that Travelers had failed to raise a material question about the quantum of damages Warehouse Wines claimed, and therefore granted judgment in its entirety.

Travelers moved for reconsideration as to damages, while reserving its appeal rights regarding coverage.  (ECF No. 115.)  On January 12, 2016, the Court granted the motion for reconsideration because it determined that the October 16, 2015 opinion "did not consider the proper application of the contract's valuation provision nor fully engage with the potential factual issues surrounding the burden of proving the amount of damages to which plaintiff is entitled."  (ECF No. 129 at 2.)  The Court thereafter scheduled a trial on damages for Wednesday, April 27, 2016.  (ECF No. 137.)

The Court held a final pretrial conference ("FPTC") on Friday, April 22, 2016.  (ECF No. 188.)  The Court then held a two-day bench trial on damages on Wednesday, April 27 and Thursday, April 28.  (ECF Nos. 193 & 195.)  Following the close of evidence, the Court invited both parties to submit written proposed findings of fact and conclusions of law, which they did.  (ECF Nos. 190 & 191.)  Finally, on Tuesday, May 10, 2016, the parties presented closing statements based on the evidence adduced at trial and in support of their proposed findings and conclusions.  (ECF No. 197.)

II.     FINDINGS OF FACT[5]

A.     Stolen Cases

Ceseretti stole 4,095 cases of inventory from Warehouse Wines.[6]  This figure can be calculated and confirmed using four sources of evidence.  First, comparing Warehouse Wines' perpetual inventory records (which detail what should have been in Bestway) with the Beehive delivery records (which detail what was in fact available to be removed from Bestway) gives us this number.  Second, Ceseretti's guilty plea and restitution judgment order is consistent with this figure.  Third, Altman testified that he evaluated this cases number, including by comparing it to Bestway's records, and deemed it accurate.[7]  And fourth, the number is consistent with a partial physical inventory Goldstein performed on January 3, 2012.

1.     Perpetual Inventory Record

Warehouse Wines employed an inventory system known as Peachtree. (Goldstein Am. Decl. ¶ 13.)  Goldstein oversaw this system and personally used it to account for every transaction between Warehouse Wines, its suppliers, and its warehouses.  (Id. ¶¶ 13-14, 20.)  Goldstein was the primary fact witness at trial, and the Court found him to be highly credible; he is a serious and experienced businessman who has heavy hands-on involvement with his company, intelligently and carefully keeps his books, and displayed good faith in pursuing this claim.

---

[5] The Court makes all findings of fact under a preponderance of the evidence standard.  Mhany Mgmt., Inc. v. Cnty. of Nassau, 819 F.3d 581, 599 (2d Cir. 2016).

[6] A list of the items stolen is included as an appendix to this opinion.

[7] The Court notes that Altman's confirmation is corroboration of other evidence and is itself unnecessary to the Court's determination.  If no evidence had been received from Altman at trial, the Court's decision would remain the same in all material respects.

When Goldstein ordered products from suppliers, he would at times direct them to make delivery at Bestway.  (Id. ¶ 22.)  He would notify Ceseretti of the expected shipment, and upon its arrival Ceseretti would check the delivery and report any variances to Goldstein.  (Id.)  Ceseretti would then create a receiving document for the delivery, which he would send to Goldstein.  (Id.)  Goldstein would then add the newly purchased products to Peachtree.  (PX-112.[8])

Approximately weekly, Warehouse Wines would fax an order to Bestway requesting delivery of certain items the following week.  (Goldstein Am. Decl. ¶¶ 23-24.)  Bestway employees would generate a shipping receipt and load the requested items into Bestway trucks.  (Id. ¶ 23.)  Upon the trucks' arrival at the Manhattan retail store, a Bestway employee would greet the truck and count the inventory delivered.  (Id. ¶ 25.)  If there was a discrepancy between what Goldstein had ordered and what Ceseretti had sent, which happened frequently in minor respects, Goldstein would notify Ceseretti by email.  (Id. ¶ 26.)  Bestway would then send a revised shipping document for that week's delivery, which Goldstein would use to update Peachtree.  (Id.)

Bestway also maintained its own inventory system.  (Id.)  Each month, Bestway would provide Warehouse Wines with a Stock Status Report which showed all Warehouse Wines inventory held at Bestway.  (Id. ¶ 27.)  Goldstein would compare that report to Peachtree to learn of, and receive an explanation for, any discrepancies prior to paying the monthly storage charges.  (Id.)

---

[8] Travelers objected to the admission of PX-112 on hearsay grounds.  The Court rules it admissible as a business record kept in the normal course of activity.  Fed. R. Evid. 803(6).

On occasion, Bestway would not be able to locate inventory that the records showed should be in the warehouse.  (Id.)  In such cases Bestway would pay for these losses, and Goldstein would remove these items from Peachtree using a code such as MIA, LOST, or BREAK.  (Id.; PX-72.[9])  However, if a case arrived from Bestway contained some number of broken bottles, Warehouse Wines would record the entire case as having been received from Bestway and relieve that amount from Peachtree.  (Trial Tr. Goldstein 327:4-11.)

Peachtree tracked each inventory item's stock status over time.  These Inventory Tracking Flows for each of the items included in Warehouse Wine's claimed loss are collected in PX-112.  They provide a clear explanation of how Peachtree worked.

For example, take the first page of the exhibit, which has a Bates stamp ending in "021."  It captures the perpetual inventory flow for item "1800 REPOSADO – 1.75," presumably cases of 1.75 liter bottles of 1800 Reposado tequila.  (PX-112 at 021.)  Peachtree indicates that Warehouse Wines first ordered 20 cases from the supplier to Bestway on September 24, 2008, then had the cases delivered to the retail site 5 at a time until January 3, 2009.  Warehouse Wines then ordered 25 more cases on March 16, 2009, and again had the cases delivered 5 at a time until September 11, 2009.  The September 11, 2009 delivery only contained 4 cases,

---

[9] Travelers objected to the admission of PX-72 on hearsay grounds.  Although PX-72 is a document prepared for this litigation, it was generated by running a simple search in Peachtree, the software Warehouse Wines used in the normal course of business.  The Court therefore deems it admissible as a business record and based on its general indicia of reliability.  Fed. R. Evid. 803(6), 807.  In any event, PX-72 simply repeats information available in PX-112 and its admission or absence is immaterial to the Court's findings and conclusion.

and on October 31, 2009, one final case was relieved from inventory as "Lost." Shortly thereafter,[10] Warehouse Wines ordered 75 more cases, and this supply was steadily delivered from Bestway to Warehouse Wines' retail location. After a delivery of 3 cases on December 16, 2011, there should have been 32 case of this item at Bestway.

The validity of the inventory transaction flow records in PX-112 is supported by a "snap shot" of the total inventory at a particular moment in time. PX-10[11] is a print-out of the Peachtree record for each item Warehouse Wines stored with Bestway, and it lists the quantity that should have been in the warehouse as of December 31, 2011. (Goldstein Am. Decl. ¶ 39; Trial Tr. Goldstein 284:10-19.) In every case, the quantity listed on PX-10 as "Qty on Hand" for a particular item matches the value of "Remaining Qty" for that item as of December 31, 2011 on PX-112. (E.g., compare PX-10 at 5460 (32 cases of 1800 REPOSADO – 1.75), with PX-112 at 021 (same).)

Before getting to the important final three lines on the first page of PX-112, the Court pauses to note and explain an important practice other entries on this page illustrate. Goldstein used a "zero out method" to test the inventory held at Bestway. (Goldstein Am. Decl. ¶ 28.) This method involved requesting that all of a given item be delivered to the retail store, leaving none in the warehouse. (Id.) For

---

[10] The Court notes that the Peachtree perpetual inventory record indicates that Warehouse Wines received 5 cases of this item on February 22, 2011, despite having no cases available at the time. (PX-112 at 021.) No party explained the meaning behind a negative value in the "Remaining Qty" column, although, as discussed below, Peachtree entries could be back-dated.

[11] Travelers objected to the admission of PX-10 on hearsay and authentication grounds. The Court finds that Goldstein adequately authenticated it and that it was generated in the normal course of business using reliable methods. Fed. R. Evid. 803(6), 807, 901.

example, the item on the front page of PX-112 was zeroed out on January 3, 2009 and October 31, 2009.[12]  (PX-112 at 021.)  Following October 31, 2009, Bestway did not store any of this item until the next order from the supplier, on February 23, 2011.  (Id.)  Any losses of this item included in Warehouse Wines' claim thus must have occurred following the latter date.

Warehouse Wines generally zeroed out 25 items per month.[13]  (Goldstein Am. Decl. ¶ 28.)  It did not, however, zero out every item it stored at Bestway.  (Trial Tr. Goldstein 339:1-5.)  Of the 84 items that constitute Warehouse Wines' claimed loss, 20 were never zeroed out.[14]  (PX-112.)

The Court now returns to the final three lines on the first page of PX-112, which tell the following story.  Goldstein testified that between the time in late December 2011 when he discovered that much of his inventory had been stolen and the eventual emptying of the Bestway warehouse at the end of January 2012, he continued to order deliveries to his retail store from Bestway.  (Trial Tr. Goldstein 247:25-248:7.)  The penultimate line in the Peachtree inventory flow for this tequila does indicate that 5 cases were delivered on January 6, 2012 and relieved from inventory, and thus not included in Warehouse Wines' claim.  (PX-112 at 021.)

---

[12] Indeed, zeroing out this item between September 11, 2009 and October 31, 2009 may have led to the discovery of the lost case relieved from inventory (and thus not included in Warehouse Wines' claim) on October 31, 2009.  (PX-112 at 021; cf. Trial Tr. Goldstein 331:2-7.)

[13] The last date on which each item was zeroed out is included in the appendix.

[14] Some of these 20 items were first purchased relatively shortly before Warehouse Wines discovered the theft.  (See PX-112 at 042-043, 073, 093, & 121.)  Others were purchased in significant quantities, such that zeroing out might have overwhelmed the retail space.  (See id. at 023-024, 036-039, 052-053, 058, 095, 100, 104, 106, & 115.)  For yet other items that were not zeroed out, neither of these explanations seems to apply.  (See id. at 056, 086-087, & 113-114.)

On January 18-21 and 26-27, Goldstein and his wife and son worked to load trailers to transport Warehouse Wines' inventory from Bestway to Beehive. (Goldstein Am. Decl. ¶ 44; Trial Tr. Goldstein 220:25-221:7.)  The Court credits Goldstein's testimony that he "counted and touched every pallet" as it was loaded into a truck.  (Trial Tr. Goldstein 238:16-24.)  The Court also credits Goldstein's testimony that he prepared the bills of lading for transportation between Bestway and Beehive, which were received into evidence as PX-79.[15]  (Id. 233:3-16.)

These bills of lading record the quantities of inventory that were removed from Bestway in late January.  (PX-79.)  For example, one of the final trucks was loaded with, among other things, 17 cases of "1800 REPOSADO 1.75."  (Id. at 5728.) Those cases were recorded and relieved from inventory, and Peachtree was updated using the code "LOAD" to reflect that these 17 cases were accounted for.  (PX-112 at 021.)

The Court credits the validity of the bills of lading based on Goldstein's testimony.  The figures that make up these bills are also further confirmed in several ways.  First, as described above, the numbers in PX-79 match those in PX-112; each "LOAD" entry in Peachtree has a corresponding entry in the bills of lading.  (E.g. compare PX-112 at 120 (19 cases of TANQUERAY GIN – LIT listed as transported to Beehive), with PX-79 at 5724 (same).)  Second, almost every entry in the bills of lading lists the item count once in Goldstein's handwriting and once in a different script, which Goldstein testified came from Beehive.  (Trial Tr. Goldstein

---

[15] Travelers objected to the admission of PX-79 on hearsay and authentication grounds.  The Court finds that Goldstein adequately authenticated it and that it was generated in the normal course of business using reliable methods.  Fed. R. Evid. 803(6), 807, 901.

235:19-237:23.)  In almost all cases the numbers match, and in the rare location where they do not Warehouse Wines' number is replaced by Beehives'.  (See, e.g., PX-79 at 5712, 5715.)

The third way the bills of lading are confirmed is through Beehive's documents, which were entered into evidence as part of a report of Kenneth Williams, a Travelers Investigator.  (PX-9.[16])  These Beehive documents list a total of 30,290 cases.  (Id. at 11.)  The cases listed on the bills of lading sum to the same amount.  Both of these documents break down that total by item in identical ways (although the items are ordered differently).  The Court therefore credits this figure as the total number of cases that were transported from Bestway to Beehive, and does not credit the 30,516 case figure Warehouse Wines included in the Proof of Loss it submitted to Travelers in April 2012.  (PX-13[17] at 5441.)  That number is not supported by any documentation, and its only purpose within the proof of loss is as a means of calculating the "in/out charge" payable to Beehive (discussed below).

Once the "LOAD" entries were entered into Peachtree, the system reflected all of the inventory that had left Bestway, either by delivery to the retail location in Manhattan or by transportation to Beehive.  The remaining quantity should have been zero for every item, and evidently it was in many cases; many of the items

---

[16] Travelers objected to the admission of PX-9 on hearsay and authentication grounds.  The Court finds that Goldstein adequately authenticated it and that it was generated in the normal course of business using reliable methods.  Fed. R. Evid. 803(6), 807, 901.

[17] Travelers objected to the admission of PX-13 on hearsay grounds.  The Court does not here consider PX-13 for the truth of the matter asserted therein (indeed, as discussed above the Court explicitly does not credit the relevant assertion in PX-13), but instead to address an apparent inconsistency Travelers highlighted.

listed in the bills of lading are not included in PX-112 and are not part of Warehouse Wines' claim.  (See, e.g., PX-79 at 5679.)

However, some items had a non-zero value in Peachtree's "Remaining Quantity" field.  (Goldstein Am. Decl. ¶ 48.)  This quantity was the unaccounted-for loss which makes up Warehouse Wines' claim.  (Id.)  These amounts were entered in Peachtree under the code "THEFT."  (E.g. PX-112 at 021.)  All of the "THEFT" entries were post-dated to January 3, 2012, the date of the partial physical inventory (discussed below), although they were not – and could not have been – calculated until all of the inventory was transported from Bestway to Beehive in late January 2012.  (Id.; Goldstein Am. Decl. ¶ 48.)  As listed in the appendix to this opinion, the "THEFT" entries collectively sum to 4,095 cases.  (PX-112, PX-9 at 2-3.)

The Court finds that the method described above accurately and competently permitted Warehouse Wines and, in turn, the Court, to determine that Ceseretti stole 4,095 cases from Warehouse Wines.

### 2.     Ceseretti Plea and Restitution

As discussed above, Ceseretti has pled guilty to stealing inventory from Warehouse Wines.  The nature of his plea and the resulting restitution order provide additional proof of the quantity of product that he stole.

On January 9, 2015, Ceseretti pled guilty to stealing "in excess of one million dollars" from Warehouse Wines before the New York Supreme Court for Suffolk County.  (PX-194 at 7:17-18.)  During that proceeding, Ceseretti's attorney informed the court that Ceseretti had "agreed to make partial restitution to the victims"

immediately, and had further "agreed to execute restitution judgment orders in favor of the four victims in this case in an amount to be determined by the Department of Probation representing any unpaid restitution balances." (Id. at 3:12-13, 4:7-11.)

Consistent with the representations at the plea in March 2015 a Restitution Judgment Order was entered against Ceseretti. (PX-195.) The order listed the amount of restitution as $1,155,479.54 for victim/judgment creditor Steven Goldstein. (Id.) This is the same amount, to the cent, that Warehouse Wines submitted to Travelers in its April 24, 2012 Proof of Loss as the value of the property Ceseretti stole. (PX-13 at 5440.)

At trial, Travelers' counsel raised a concern that the identity between Warehouse Wines' and Ceseretti's respective valuations indicated that it arose from an "echo chamber." (ECF No. 197 at 56:8-60:4.) While there is no evidence in the record from which the Court could determine how the restitution amount was reached, it is true that calculating this figure seems to require knowledge of both the number of cases stolen and the price per case in January 2012.

Ultimately, the Court is convinced that Ceseretti's allocution and restitution amount support the conclusion that he stole 4,095 cases of Warehouse Wines' products. In addition to the precise amount listed in the Restitution Judgment Order, Ceseretti also personally affirmed that he had stolen "in excess of one million dollars" from Warehouse Wines. (PX-194 at 7:12-20.) This figure, like the judgment, demonstrates Ceseretti's acknowledgment of the magnitude of the theft.

Given Ceseretti's legal obligation to pay the amount listed in the judgment entered against him, he had an important financial incentive not to inflate the size of his theft.  Finally, Ceseretti owes restitution not only to Warehouse Wines but also to the other retailers who used Bestway warehouses.  Each retailer is due to receive a percentage of Ceseretti's restitution payments, calculated based on each retailer's loss.  (Id. at 3:12-5:2; Trial Tr. Goldstein 227:19-23.)  It follows that each retailer had an incentive to monitor the restitution amounts owed to the others for signs that such amounts were inflated.

As a result, the Court concludes that Ceseretti's plea allocation and restitution order support the finding of fact that Ceseretti stole 4,095 cases from Warehouse Wines.

### 3.   Altman

Kenneth Altman, the accountant Travelers hired to investigate Warehouse Wines' claim in early 2012, testified at trial.[18]  (Trial Tr. Altman 59:6-193:8.)  His testimony provided supplemental support for quantifying the size of the loss at 4,095 cases.  Altman testified that he surveyed Warehouse Wines' claimed loss and "validated it was consistent with the records that [he] saw."  (Id. 81:19-20.)  He further testified that nothing in his investigation had demonstrated "that those records aren't reliable."  (Id. 98:23-24.)  To the contrary, Altman explained that for

---

[18] Altman was the subject of dueling motions in limine; Warehouse Wines sought to estop Travelers from contradicting Altman's report and argued that it constituted an agent admission, while Travelers sought to preclude any use of Altman as an expert witness.  (ECF Nos. 164 & 168.)  As discussed in the Court's memorandum decision and order of April 19, 2016, Altman's testimony was accepted as relevant but neither binding on Travelers as an agent admission nor competent expert testimony.  (ECF No. 183.)  In all events, Altman's testimony is unnecessary; even in its absence there is a factual record more than sufficient to support the Court's findings as set forth herein.

certain items he had requested the supplier invoices to validate their initial delivery to Bestway and the date, quantity, and price of purchase.  (Id. 111:12-112:1.)  Each of the twelve items tested was consistent with Warehouse Wines' records, which allowed Altman to "conclude that the perpetual inventory was accurate."  (Id. 119:4-5.)

Altman's confirmation that Warehouse Wines' accurately depicted the size of its claimed loss is bolstered by the fact that his report to Travelers did mention a different concern, specifically regarding documentation of the claimed moving costs.  (PX-17[19] at 2053.)  The report does not contain any similar hesitation regarding the number of cases stolen, nor did Altman indicate that he harbored any such concern at trial.  (Trial Tr. Altman 128:13-19.)

4.    Partial Physical Inventory

As discussed above, on January 3, 2012, Goldstein visited the Bestway warehouse and conducted a partial physical inventory.  He used a print-out from Peachtree that captured the expected quantity on hand as of December 31, 2011 for each item Warehouse Wines stored there.  (Goldstein Am. Decl. ¶¶ 37-38; PX-10.)  His record from this partial physical inventory provides further supplementary support for the 4,095 cases figure.

As Goldstein explained at trial, he did not believe he had the time or manpower to do a full inventory of Bestway when he visited on January 3.  (Trial

---

[19] Travelers objected to the admission of PX-17 on hearsay, relevance, and improper opinion grounds.  As to this point, the Court does not consider PX-17 for the truth of the matter asserted, but instead for the fact that it raised certain concerns and not others.  The Court also finds that PX-17 was admissible generally on the basis of significant indicia of reliability, including its source, recipient, purpose, and age.

Tr. Goldstein 259:1-260:3.)  Instead, his goal was "to understand damage control, understand what [were] the general conditions, general counts." (Id. 260:3-5.) While many of the items listed on the Peachtree print-out have a handwritten number next to the item description representing the number of cases Goldstein observed during the partial inventory, many are blank.  (PX-10.)

The results of the partial physical inventory support Warehouse Wines' 4,095 cases figure because the number of cases Goldstein recorded observing largely matches the number of items later removed from Bestway.  For example, Goldstein recorded 20 cases of BOMBAY SAPPHIRE LIT, 19 cases of CIROC VODKA COCONUT – LIT, and 10 cases of CIROC VODKA RED BERRY – LIT.  (PX-10 at 5460-62.)  The inventory transaction flow for each of these items similarly reflects that precisely that many cases were removed from Bestway after January 3, 2012. (PX-112 at 35, 42, 43.)  In every instance in which the numbers in PX-10 and PX-112 disagree but one, the inventory transaction flow shows that there were actually more cases subsequently removed from Bestway than Goldstein counted on January 3, 2012.  (E.g., compare PX-10 at 5460 (21 cases of ABSOLUT CITRON – LIT and 46 cases of BAILEYS IRISH CREAM – 750 GLAS), with PX-112 at 23, 32 (28 cases of ABSOLUT CITRON – LIT and 49 cases of BAILEYS IRISH CREAM – 750 GLAS).)  This type of discrepancy is logical, as Goldstein may have missed cases in his partial review, and serves to reduce Warehouse Wines' ultimate claim, as fewer cases were missing than it originally seemed.

As mentioned, one product exhibited a different pattern.  According to Peachtree, there should have been 45 cases of J WALKER DOUBLE BLACK – 750 in Bestway when Goldstein visited.  (PX-10 at 5465.)  The record of the partial physical inventory indicates that Goldstein observed "15 + 30," that is, 45, cases on January 3, 2016.  (Id.)  However, the inventory transaction flow for this item shows that 15 cases were delivered to the retail location on January 26, 2012, and none were sent to Beehive; as a result, 30 cases of this product are included in Warehouse Wines' claim.  (PX-112 at 72.)   At trial, Goldstein testified that he did not know how to explain this particular discrepancy.  (Trial Tr. Goldstein 391:7-15.)

Notwithstanding this 30 case disconnect, the Court otherwise finds that the record of Goldstein's partial physical inventory on January 3, 2016 supports Warehouse Wines' claim that 4,095 cases were stolen.  The large majority of the items that make up the claim were either not inventoried, inventoried in a manner consistent with the claimed loss, or inventoried in a way that would have increased the claimed loss had it not been later revised.  The one item that is an exception does not meaningfully challenge PX-10's significant value as a spot-check of PX-112.  The partial physical inventory therefore substantiates Warehouse Wines' claim that Ceseretti stole 4,095 cases of its product.

B.    Timing of Theft and Replacement

As described above, the major shortages indicating theft emerged in December 2011, and by December 28, 2011 Ceseretti had informed Goldstein that he would not be able to deliver certain items.  At his plea allocution in January

2015, Ceseretti answered affirmatively when asked whether he had stolen from

Warehouse Wines "on or about and between 2010 and December 22nd of 2011."

(PX-194 at 7:12-20.)  Other than the possible post-January 3, 2012 disappearance of

30 cases of J WALKER DOUBLE BLACK – 750, discussed above, there is no

meaningful evidence in the record from which the Court could conclude that the

theft began before or continued after December 2011.  (C.f. Trial Tr. Goldstein

358:15-17.)  The Court therefore finds that Ceseretti's theft occurred during

December 2011.

Goldstein credibly testified that, even if he had known the full extent of his

loss as of December 26, 2011 (the date of the major shortages that presaged

discovery of Ceseretti's theft), he would not have been able to fully replace his stock

before January 2012.  (Id. 363:22-366:11.)  While there was evidence that

Warehouse Wines did receive deliveries at its retail location directly from suppliers

in the final days of December 2011 and that Warehouse Wines placed orders in late

December using a "bill-and-hold" method, there was insufficient evidence to

determine that this method could have been used before year end to replace entirely

the stolen inventory – particularly where the extent of the theft was not yet known.

(Id. 400:1-403:11.)

The insurance policy Travelers issued Warehouse Wines provides that the

value of covered property will be the least of the property's actual cash value, the

cost of restoring the property to its prior condition, or the cost of replacing the

property.  (PX-37 at 15.)  It further provides that "[i]n the event of loss or damage,

20

the value of property will be determined as of the time of loss or damage." (Id.)  A separate provision on the same page provides that legal action against Travelers must be brought "within 2 years after [the insured] first ha[s] knowledge of the direct loss or damage." (Id.)

C.    Product Pricing

In New York, the prices suppliers charge per case of wine or liquor are published monthly. (Goldstein Am. Decl. ¶ 49.)  Warehouse Wines established the value of its loss using the January 2012 prices. (PX-13 at 5439-40; PX-114[20]; Trial Tr. Goldstein 358:6-14.)  These prices for each stolen item are included in the appendix.

Neither party entered the publication listing the December 2011 prices into evidence.  However, the December 2011 prices of at least some of the items Ceseretti stole are available in the record.  First, there are a set of invoices from that month which document the price Warehouse Wines paid to obtain cases of KETEL ONE – 1.75 (DX-9 at 5363), JACK DANIELS – LIT (id. at 4776), J WALKER BLACK – 750, LITER, and 1.75 (id. at 4778), GLENFIDDICH 12YR 750 (id. at 4779), STOLICHNAYA 80 – LIT and 1.75 (DX-11 at 4774), and AMARETTO DI SARONNO – LITER (id. at 4775).  In addition, the report Altman produced for Travelers in March 2012 included the price at last purchase for each of the items he tested.  (See PX-17 at 2049-50, 2059-2110.)  One of these items, DEWARS WHITE LABEL – 1.75, had most recently been purchased in December 2011.  (Id. at 2095-

---

[20] Travelers objected to the admission of PX-114 on hearsay grounds.  The Court rules it admissible as a business record kept in the normal course of activity and as generally reliable.  Fed. R. Evid. 803(6), 807.

96.)  Accordingly, Altman included in his report both the pricing page from December 2011 that listed Dewar's White Label products, including both the tested product and DEWARS WHITE LABEL – LITER.  (Id. at 2097.)

Thus, for 11 of the 84 stolen items that make up the bulk of Warehouse Wines' claim, the record includes evidence of per-case prices in both December 2011 and January 2012.  Comparing those prices indicates that the December 2011 prices of these 11 items were, on average, 87% of the January 2012 prices.[21]

D.    Moving Costs

Warehouse Wines incurred a number of costs associated with moving its inventory out of Bestway and into Beehive.  (PX-13 at 5441.)  Specifically, it incurred $5,745 in staffing costs, $603 in hotel costs, $142 in travel costs, $473 in meal costs, $167 in long-distance telephone costs, and $9,075 in trailer costs.  (Id.;

---

[21] The following table displays the pricing information for these products.

| Item | Dec. 2011 price ($) | Cite | Jan. 2012 price ($) | Cite | % |
|------|------|------|------|------|------|
| AMARETTO DI SARONNO - LITER | 267.88 | DX-11 | 318.23 | PX-114 | 84 |
| DEWARS WHITE LABEL - 1.75 | 179.94 | PX-17 | 197.96 | PX-114 | 91 |
| DEWARS WHITE LABEL - LITER | 317.93 | PX-17 | 317.93 | PX-114 | 100 |
| GLENFIDDICH 12YR 750 | 411.28 | DX-9 | 510.40 | PX-114 | 81 |
| J WALKER BLACK - 1.75 | 339.91 | DX-9 | 432.29 | PX-114 | 79 |
| J WALKER BLACK – 750 | 363.29 | DX-9 | 423.29 | PX-114 | 86 |
| J WALKER BLACK – LIT | 460.42 | DX-9 | 460.42 | PX-114 | 100 |
| JACK DANIELS - LIT | 304.41 | DX-9 | 364.45 | PX-114 | 84 |
| KETEL ONE – 1.75 | 219.91 | DX-9 | 247.51 | PX-114 | 89 |
| STOLICHNAYA 80 – 1.75 | 165.90 | DX-11 | 198.96 | PX-114 | 83 |
| STOLICHNAYA 80 – LIT | 232.45 | DX-11 | 280.42 | PX-114 | 83 |
| Total | 3,263.32 | | 3,751.86 | | 87 |

Goldstein Am. Decl. ¶¶ 44-46.)  These costs total $16,205.  The Court finds that Warehouse Wines properly and actually incurred these costs.

    E.    <u>Restitution</u>

As described above, Ceseretti pled guilty on January 9, 2015.  (PX-194 at 7:17-18.)  During that proceeding, Ceseretti's attorney informed the court that Ceseretti had "agreed to make partial restitution to the victims in this case in the amount of $308,000," which would be "paid to the Office of the District Attorney on or before the date of sentence."  (<u>Id.</u> at 3:12-18.)  Ceseretti further "agreed to execute restitution judgment orders in favor of the four victims in this case in an amount to be determined by the Department of Probation representing any unpaid restitution balances," and specifically agreed to "make an annual payment in the amount of $20,000 to the Office of the District Attorney" during each of the five years of his probation.  (<u>Id.</u> at 4:7-18.)

Consistent with the representations at the plea, and as also discussed above, in March 2015 a Restitution Judgment Order was entered against Ceseretti.  (PX-195.)  The order listed the amount of restitution as $1,155,479.54 for victim/judgment creditor Steven Goldstein.  (<u>Id.</u>)

In May 2015, Goldstein received a check from Ceseretti's attorneys in the amount of $185,594.40.  (Trial Tr. Goldstein 228:5-7.)  This represented approximately 62% of the initial amount Ceseretti had placed into escrow prior to his sentencing.  Goldstein expected 62% of the five annual $20,000 restitution payments Ceseretti was obligated to pay under the conditions of his sentence.  (<u>Id.</u>

227:15-23.)  He also was aware of the Restitution Judgment Order for the whole amount of Ceseretti's theft.  (Id. 229:8-11.)  Since the initial May 2015 check, Goldstein had received three additional restitution checks, totaling $4,750.  (Id. 226:19-23.)  Thus, as of the close of evidence in this case on April 28, 2016, Warehouse Wines had received $190,344.40 in restitution payments from Ceseretti. More than one year had passed since Ceseretti's guilty plea and Restitution Judgment Order, but a year had not yet passed since the first restitution checks were distributed.

Warehouse Wines' treatment of these restitution amounts was initially troublingly opaque.  For example, on November 4, 2015, after the Court granted summary judgment to Warehouse Wines in its entirety but before the Court agreed to reconsider damages, Warehouse Wines submitted a proposed form of judgment. (ECF No. 121.)  This proposed judgment was for $1,538.771.95, an amount which does not account for the May 2015 restitution payment Warehouse Wines had already received.  (Id.)  Similarly, the first, unsigned draft of Goldstein's trial declaration stated that Warehouse Wines had "sustained unreimbursed damages in an amount of $1,177,788.00."  (ECF No. 156 at 15.)

However, Warehouse Wines did go on to edit Goldstein's trial declaration. The amended declaration, the only one Goldstein swore to in open court, removed the word "unreimbursed" from its concluding paragraph.  (See Goldstein Am. Decl. ¶ 57.)  When Travelers raised the question of reimbursement at the April 22 FPTC, Warehouse Wines readily acknowledged that it had received restitution and

informed the Court that "there may even be more coming in the future." (ECF No. 188 at 5:24.) Furthermore, on January 29, 2015, more than one year before the trial, Warehouse Wines had submitted a letter to the Court stating that Ceseretti had entered his guilty plea. (ECF No. 90.) Enclosed with the letter was a transcript of the plea proceeding, which included the references to restitution discussed above. (Id. at Exh. 1.)

The Court therefore finds that, although Warehouse Wines fell significantly short of its obligation to keep the Court and Travelers properly informed about the restitution process, it did not do so intentionally or with an eye to recovering more from Travelers than it was due. The Court credits Warehouse Wines' explanation that it intended to address the role of restitution following the Court's determination of the overall damages amount.

F.    "In/Out Charges"

Goldstein calculated the total costs of moving the remaining inventory from Bestway to Beehive to be $22,308. (Goldstein Am. Decl. ¶ 47; T Prop. ¶ 45; WW Prop. ¶ 60.) Included in this total was $6,103 for "in/out charges" from Beehive. (Goldstein Am. Decl. ¶ 45; T Prop. ¶ 45; WW Prop. ¶ 58.) This amount was based on 20 cent/case rate applied to 30,516 cases, and was included in the Proof of Loss Warehouse Wines submitted to Travelers on April 24, 2012. (PX-13 at 6; Trial Tr. Goldstein 249:1-5.) As discussed above, this number of cases was an error; only 30,290 cases were actually received into Beehive.

The number 30,516 does not appear on any documents received from Beehive. Indeed, there is no invoice or receipt for "in/out charges" from Beehive at all.  As Goldstein testified, Beehive never charged Warehouse Wines for this expense, and there is no reason to believe it ever will.  (Trial Tr. Goldstein 249:6-19.)  Goldstein further testified that it was his understanding that Beehive had retired the "in/out charge" debt as part of a "right of offset" when much of the inventory Warehouse Wines stored with Beehive was flooded in Hurricane Sandy, ten months after the January 2012 move.  (Id. 251:7-20.)  According to Goldstein, the "offsets" associated with flood losses in late 2012 included not only the 20 cent/case "in/out charge" but also a more significant overall $1.62/case charge which Beehive never collected from Warehouse Wines.[22]  (Id. 254:6-16.)  He also, however, testified that he had never specifically discussed or confirmed this understanding with anyone from Beehive. (Id. 251:21-25.)

The Court credits Goldstein's testimony on this point and finds that, although Warehouse Wines reasonably anticipated having to pay Beehive an "in/out charge" in connection with moving its inventory out of Bestway at the time of the proof of loss, Warehouse Wines never actually paid Beehive any "in/out charge."

G.    Deductible

Under the terms of the insurance contract, the inventory Warehouse Wines stored at Bestway was subject to a $25,000 deductible.  (PX-37 at 24.)  This deductible applied to each "occurrence."  (Id. at 17.)  Warehouse Wines did not

---

[22] This $1.62/case charge was not part of Warehouse Wine's claimed loss.  (See PX-13.)

account for this deductible in the proof of loss it submitted to Travelers.  (Trial Tr.

Goldstein 352:24-353:2.)

III.    CONCLUSIONS OF LAW

    A.    <u>Warehouse Wines Has Met Its Burden Of Proof As To Damages</u>

    Under New York law, a plaintiff bears the burden of proving a breach of

contract by a preponderance of the evidence.  <u>Diesel Props S.r.l. v. Greystone</u>

<u>Business Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011).  "The insured bears the

burden of proving the amount of damage, and the insurance company bears the

burden of proving facts in mitigation of damage."  <u>C-Suzanne Beauty Salon, Ltd. v.</u>

<u>Gen. Ins. Co. of Am.</u>, 574 F.2d 106, 114 (2d Cir. 1978) (footnote omitted).  Where

there are multiple means of calculating damages, "the plaintiff need only present

evidence as to one measure of damages, and that measure will be used when neither

party presents evidence going to the other measure."  <u>Jenkins v. Etlinger</u>, 432

N.E.2d 589, 591 (N.Y. 1982).

    Although it is Warehouse Wines' burden to prove its entitlement to damages

from Travelers' wrongful refusal to pay its claim, once the fact of damages is

established "'[t]he plaintiff need only show a stable foundation for a reasonable

estimate' of the damage incurred as a result of the breach."  <u>Tractebel Energy</u>

<u>Marketing, Inc. v. AEP Power Marketing, Inc.</u>, 487 F.3d 89, 110 (2d Cir. 2007)

(quoting <u>Contemporary Mission, Inc. v. Famous Music Corp.</u>, 557 F.2d 918, 926 (2d

Cir. 1977)).  "Such an estimate necessarily requires some improvisation, and the

party who has caused the loss may not insist on theoretical perfection."  <u>Id.</u> at 111

(quoting <u>Entis v. Atl. Wire & Cable Corp.</u>, 335 F.2d 759, 763 (2d Cir. 1964)).  "The rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only such reasonable certainty as serves as a basis for the ordinary conduct of human affairs."  36 N.Y. Jur. 2d Damages § 12 (2016) (footnotes omitted).

Courts will refuse to award damages which are "merely speculative, possible, and imaginary,"  <u>Wakeman v. Wheeler & Wilson Mfg. Co.</u>, 4 N.E. 264, 266 (N.Y. 1886), or for which a party has "provided no substantiation whatsoever."  <u>Baskin-Robbins Inc. v. S & N Prinja, Inc.</u>, 78 F. Supp. 2d 226, 232 (S.D.N.Y. 1999).  In some circumstances, a party's inability to distinguish injury caused by a breach from unrelated injuries may prevent it from recovering damages.  <u>See</u> <u>Meda AB v. 3M Co.</u>, 969 F. Supp. 2d 360, 388-90 (S.D.N.Y. 2013) (noting, in dicta, that damages had not been proved due to a failure to "isolate the effects of the breach or misrepresentation").  However, unless the difficulty in calculating damages is extreme or insurmountable, an injured party should be made whole to the law's best ability.  <u>See, e.g.</u>, <u>Contemporary Mission</u>, 557 F.2d at 926-27 (approving of damages for lost sales profits based on improper failure to promote).

It would be contrary to general principles of contract law, which are heightened in favor of insured parties in insurance disputes, <u>cf.</u> <u>Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.</u>, 225 F.3d 270, 276 (2d Cir. 2000), to demand that Warehouse Wines either advance perfect proof of the amount of its loss or receive no award whatsoever.  Instead, consistent with both precedent and fairness, "[t]he law

will make the best appraisal that it can, summoning to its service whatever aids it can command." Contemporary Mission, 557 F.2d at 926-27 (quoting Sinclair Rfg. Co. v. Jenkins Co., 289 U.S. 689, 697 (1933)).

Warehouse Wines has met its burden of providing a stable and reasonable estimate of the damage it suffered and which Travelers is required to indemnify. As discussed above, Warehouse Wines has established the quantity and type of cases that were stolen. It has also provided evidence of a relevant price for each case, specifically the January 2012 price. The crucial evidence, as discussed above, included Goldstein's written declaration and trial testimony, as well as certain documents admissible as reliable business records, including but not limited to PX-10, PX-79, PX-112, and PX-114.[23]  Importantly, damages in this case are based entirely on historical facts; they do not inherently require the Court to hypothesize future performance, market trends, etc.

As discussed further below, Travelers has persuasively argued that these prices do not perfectly reflect the price that the contract requires be applied. However, plaintiffs have introduced evidence which allows the Court to calculate a proper price based on the evidence in the record. In so doing, they have carried their burden as to the quantum of damages.

Contrary to Travelers' argument, New York does not impose an extra-contractual requirement that all insured parties conduct periodic physical inventories of their stored products or forgo insurance coverage. The cases

---

[23] The Court specifically notes that it need not rely on any testimony from Altman to reach all of its determinations of fact and conclusions of law.

Travelers cites in support of this view, <u>New York Univ. v. Continental Ins. Co.</u>, 662 N.E.2d 763 (N.Y. 1995), and <u>Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.</u>, 457 N.E.2d 761 (N.Y. 1983), do not stand for the broad proposition Travelers advances.

As discussed in both the Court's October 16, 2015 opinion granting summary judgment to Warehouse Wines on liability (ECF No. 114) and the Court's April 19, 2016 opinion on motions <u>in limine</u> (ECF No. 183), the <u>NYU</u> and <u>Ace Wire</u> cases concerned insurance for losses caused by an employee's dishonest or criminal acts. <u>See</u> <u>NYU</u>, 662 N.E.2d at 771; <u>Ace Wire</u>, 457 N.E.2d at 763. The cases cited by the New York Court of Appeals in <u>Ace Wire</u> clarify that insurers may insist upon an inventory exclusion to protect themselves from "[t]he possibility that [a] loss was only a paper loss resulting from an error on the inventory." <u>Stadham Co. v. Century Indem. Co.</u>, 74 A.2d 511, 514 (Pa. Super. Ct. 1950). However, the same cases further clarify that such a policy does not prevent an insured from proving loss through "an enumeration of each missing item, suit by suit, based upon a check of the stock record … against the stock actually on hand." <u>Sun Ins. Co. of N.Y. v. Cullum's Men Shop, Inc.</u>, 331 F.2d 988, 991 (5th Cir. 1964).

The insurance policy that governed the relationship between Warehouse Wines and Travelers required the insured to take a number of steps related to the records that might be the basis of a claim. For example, Warehouse Wines committed to allow Travelers to "examine and audit [its] books and records as they relate to this policy at any time during the policy period and up to three years afterwards." (PX-37 at 5.) Travelers was also permitted, but not required, to

"[m]ake inspections and surveys at any time" and recommend changes as a result. (Id.)  In the event of a loss, Travelers was permitted to examine and copy Warehouse Wines' books and records, and examine any insured under oath "about any matter relating to this insurance or the claim."  (Id. at 13.)

If Travelers wished to condition its coverage on Warehouse Wines' performance of physical inventories at the third-party warehouses it employed, it was incumbent upon Travelers to clearly include such a requirement in the agreement between the parties.  See City of New York v. Evanston Ins. Co., 830 N.Y.S.2d 299, 302 (App. Div. 2007) (courts construe ambiguous policy language in favor of coverage and only exclude coverage if exclusion is the only fair interpretation).  No such requirement appears in the policy, and the Court will not retroactively alter the parties' agreement by imposing it.[24]  See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006).

The Court concludes, as a matter of law, that Warehouse Wines has carried its burden to prove its entitlement to damages and a stable basis for those damages for most of its claim.  The proper valuation of the stolen merchandise is discussed below.  Warehouse Wines incurred $16,205 in moving costs; the Beehive "in/out charges" were never incurred and the argument that they were a portion of the

---

[24] In any event, a periodic physical inventory would likely have provided little information relevant to determining damages in this case.  The stated purpose of such a requirement is to avoid "losses that may accumulate to excessive amounts over a period of years."  NYU, 662 N.E.2d at 772. However, the zero-out method Goldstein employed, combined with the evidence that the bulk of the thefts occurred during December 2011, suggest that a physical inventory would not have appreciably reduced the proper size of Warehouse Wines' claim.

Hurricane Sandy-related negotiations between Warehouse Wines and Beehive is too speculative and unsubstantiated to form a proper basis for damages.

     B.     <u>Warehouse Wines' Claim Must Be Valued As Of The Date Of Loss</u>

"The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control." <u>Id.</u> (quoting <u>Newmont Mines Ltd. v. Hanover Ins. Co.</u>, 784 F.2d 127, 135 (2d Cir. 1986)). "Under New York law, this is accomplished by looking to 'the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" <u>Id.</u> (quoting <u>Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.</u>, 361 N.E.2d 999, 1001 (N.Y. 1977)).

The Valuation provision of the insurance policy Travelers issued Warehouse Wines requires that "the value of property … be determined as of the time of loss or damage." (PX-37 at 15.) There can be no doubt that this language means what it says. On its face, this timing provision does not contain any suggestion that the "time of loss" should be interpreted as the "time of discovery of loss." Moreover, on the very same page of the insurance contract, the parties did adopt a deadline that runs beginning when the insured "first ha[s] knowledge of the direct loss or damage." (<u>Id.</u>) The fact that such a rule appears on the same page as the binding language of the valuation provision demonstrates that the parties knew how to adopt a "time of discovery" rule but chose not to for valuation purposes.

The valuation provision is equally unamenable to Warehouse Wines' alternative argument that, because replacing the stolen inventory in December

would have proved logistically difficult (see Trial Tr. Goldstein 404:14-23), the loss should be valued using January prices.  As an initial matter, there is evidence in the record that Warehouse Wines did order a significant quantity of product, totaling at least multiple thousands of cases, in the final days of December 2011, and that some or all of this product remained with the suppliers under "bill and hold" arrangements.  (See id. 401:6-402:2.)  More importantly, expanding the timing of valuation to encompass various practical challenges in replacing the stolen products would diverge even further from the stated "as of the time of loss" rule than would a "date of discovery" interpretation because products cannot be replaced until they are known to be missing.  Again, had the parties intended to adopt a different rule, they would not have included the phrase "determined as of the time of loss or damage" in the valuation provision.

Therefore, Warehouse Wines' stolen products must be valued as of the time of their theft, which the Court has found occurred in December 2011.  Despite the apparent ease with which one can acquire the monthly publicly listed prices of wholesale alcohol in New York, neither party submitted a full list of December 2011 prices.  However, Goldstein acknowledged at trial that prices were generally lower in December 2011 than in January 2012.  (Id. 359:17-20.)  This is consistent with the 11 products the Court was able to compare across the two months, which as discussed above were available in December 2011 at 87% of the January 2012 prices.  (See PX-17 at 2097, DX-9 at 4776-79, 5363; DX-11 at 4774-75, PX-114.)

The Court therefore concludes that the evidence and legal requirements of this case require the Court to apply a 13% discount to the January 2012 prices that appeared in Warehouse Wines' proof of loss to determine the appropriate value of its stolen property.  As demonstrated in the appendix, applying this discount generates a total theft value of $1,007,480.40.  The Court finds that this figure accurately represents "the best appraisal that [the Court] can" make of the value of the property at the heart of Warehouse Wines' claim.  <u>Contemporary Mission, Inc. v. Famous Music Corp.</u>, 557 F.2d 918, 926-27 (2d Cir. 1977) (quoting <u>Sinclair Rfg. Co. v. Jenkins Co.</u>, 289 U.S. 689, 697 (1933)).

    C.    <u>Ceseretti's Theft Was A Single Occurrence</u>

The insurance policy Travelers issued Warehouse Wines provides that property stored at Bestway was subject to a $25,000 deductible on a per "occurrence" basis.  (PX-37 at 17-18, 24.)  The policy does not define "occurrence." The Second Circuit has held that in the context of property damage and loss insurance, "the meaning of 'occurrence' must be interpreted in the context of the specific policy and facts of [each] case."  <u>Newmont Mines Ltd. v. Hanover Ins. Co.</u>, 784 F.2d 127, 136 n.9 (2d Cir. 1986).  It has further explained that an event amounts to a single occurrence when "damage occurring at one point in time was merely part of a single, continuous event that already had caused other damage." <u>Id.</u> at 136.

Applying these principles, the Second Circuit has affirmed a jury's determination that "the collapse on two different days of two separate sections of

the roof of a cooper concentrator mill building," each caused by snow buildup, were separate occurrences based on evidence that "each half of the concentrator was structurally distinct and capable of supporting a weight of ice and snow independent of the other" and the strong deference due to jury determinations.  Id. at 129, 137.  It also ruled that whether the two plane crashes that constituted the September 11th terrorist attack was one occurrence or two was, at the summary judgment stage, "an open question as to which reasonable finders of fact could reach different conclusions."  World Trade Ctr. Props. L.L.C. v. Hardford Fire Ins. Co., 345 F.3d 154, 190 (2d Cir. 2003).  The Second Circuit has repeatedly emphasized that the intent of the parties dictates and that courts should thus examine the reasonable expectations of coverage under insurance policies.  See, e.g., In re Prudential Lines Inc., 158 F.3d 65, 79 (2d Cir. 1998).

The Court concludes, based on the record at trial and the policy language at issue, that Ceseretti's theft was a single occurrence.  There is no indication in the record as to whether Ceseretti stole all of the missing inventory at one fell swoop or over time.  (See Trial Tr. Ceseretti 54:1-55:25 (invoking Fifth Amendment right against self-incrimination).)  There is no evidence of any "clear separation in time [between thefts] or change in circumstances of [the thefts.]"  Nat'l Union Fire Ins. Co. v. Stroh Co., No. 98 Civ. 8248(DLC), 2000 WL 264320, at *4 (S.D.N.Y. 2000). Moreover, there is no indication that the policy, which included coverage for dishonest acts by carriers for hire (see ECF No. 114), was intended to only protect Warehouse Wines from incidents in which a dishonest carrier stole more than

$25,000 at one instant, rather than through a single continuous method that unfolded over a number of weeks.  In light of the principles of contract interpretation which apply to insurance policies, the Court will not read such a limitation into the parties' use of the undefined word "occurrence."

        D.    <u>Calculation</u>

Warehouse Wines has demonstrated, as a matter of the Court's factual findings and legal conclusions, that it is entitled to $1,007,480.40 for its stolen products and $16,205 for its moving expenses.  The record also indicates that a $25,000 deductible applies to this claim, and that Warehouse Wines has received $190,344.40 in restitution from Ceseretti.  Summing these figures generates a total outstanding amount of $808,341, excluding interest.

## IV.   JUDGMENT

For the reasons stated above, Warehouse Wines is entitled to damages. Judgment shall be entered in favor of Warehouse Wines in the pre-interest amount of $808,341.  The Clerk of Court is respectfully directed to prepare a form of judgment which reflects this amount plus any pre-judgment interest to which Warehouse Wines is properly entitled, and to close this matter.


        SO ORDERED.

Dated:      New York, New York
            July 14, 2016

                                     _____
                                        KATHERINE B. FORREST
                                   United States District Judge

APPENDIX

| Item | Last Date Zeroed | Theft | Jan. 2012 Price ($) | Adj./Dec. 2011 Price ($) | Adj. Value ($) |
|---|---|---|---|---|---|
| 1800 REPOSADO - 1.75 | 2/23/11 | 10 | 195.90 | 170.43 | 1,704.30 |
| 1800 SILVER - 1.75 | 2/23/11 | 5 | 195.90 | 170.43 | 852.15 |
| ABSOLUT CITRON - LIT | N/A | 15 | 236.90 | 206.10 | 3,091.50 |
| ABSOLUT MANDRIN - LIT | N/A | 5 | 236.90 | 206.10 | 1,030.50 |
| AMARETTO DI SARONNO - LITER | 11/22/11 | 10 | 318.23 | 267.88 | 2,678.80 |
| BACARDI 151 - LIT | 11/30/10 | 4 | 244.68 | 212.87 | 851.48 |
| BACARDI GOLD - 1.75 | 12/2/11 | 10 | 119.94 | 104.35 | 1,043.50 |
| BACARDI LIGHT - 1.75 | 12/2/11 | 45 | 119.94 | 104.35 | 4,695.75 |
| BACARDI LIGHT - LIT | 5/20/10 | 32 | 175.13 | 152.36 | 4,875.52 |
| BAILEYS IRISH CREAM - 750 GLAS | 10/18/11 | 51 | 138.60 | 120.58 | 6,149.58 |
| BELVEDERE VODKA-750 SILVER BTL | 2/1/11 | 60 | 188.95 | 164.39 | 9,863.40 |
| BOMBAY SAPPHIRE 1.75 | 4/28/11 | 20 | 242.94 | 211.36 | 4,227.20 |
| BOMBAY SAPPHIRE LIT | 5/27/10 | 47 | 341.88 | 297.44 | 13,979.68 |
| BUSHMILLS IRISH WHISKEY - 1.75 | N/A | 4 | 257.11 | 223.69 | 894.76 |
| BUSHMILLS IRISH WHISKEY - LIT | N/A | 14 | 359.63 | 312.88 | 4,380.32 |
| CAPTAIN MORGAN RUM - LIT | 5/31/11 | 68 | 255.26 | 222.08 | 15,101.44 |
| CAPTAIN MORGAN RUM 70pr - 1.7 | 5/31/11 | 15 | 183.32 | 159.49 | 2,392.35 |
| CIROC VODKA COCONUT - LIT | N/A | 15 | 206.22 | 179.41 | 2,691.15 |
| CIROC VODKA RED BERRY - LIT | N/A | 5 | 206.22 | 179.41 | 897.05 |
| COINTREAU - LITER 194 | 9/29/11 | 40 | 184.62 | 160.62 | 6,424.80 |
| CROWN ROYAL - 750 | 8/30/11 | 2 | 377.69 | 328.59 | 657.18 |
| CROWN ROYAL - LITER | 8/30/11 | 11 | 422.02 | 367.16 | 4,038.76 |
| CUERVO GOLD - LIT | 6/28/11 | 140 | 235.17 | 204.60 | 28,644.00 |
| CUERVO TRADITIONAL - 750 | 12/6/11 | 5 | 183.36 | 159.52 | 797.60 |
| DEWARS WHITE LABEL - 1.75 | 12/6/11 | 169 | 197.96 | 179.94 | 30,409.86 |
| DEWARS WHITE LABEL - LITER | 11/22/10 | 42 | 317.93 | 317.93 | 13,353.06 |
| EL JIMADOR TEQ - REPOSADO- LIT | N/A | 70 | 232.44 | 202.22 | 14,155.40 |
| FREIXENET CORDON NEGRO - 1.5 | 12/7/11 | 11 | 101.99 | 88.73 | 976.03 |
| GLENFIDDICH 12YR - LITER | N/A | 6 | 598.45 | 520.65 | 3,123.90 |
| GLENFIDDICH 12YR 750 | 12/28/09 | 42 | 510.40 | 411.28 | 17,273.76 |
| GRAND MARNIER - 750 | N/A | 26 | 397.00 | 345.39 | 8,980.14 |
| GRAND MARNIER - LIT | 12/31/10 | 35 | 487.00 | 423.69 | 14,829.15 |
| GREY GOOSE - 1.75 | 12/21/11 | 34 | 321.54 | 279.74 | 9,511.16 |
| GREY GOOSE - 750 | 12/14/09 | 67 | 326.30 | 283.88 | 19,019.96 |
| GREY GOOSE - LITER | 4/16/09 | 636 | 194.96 | 169.62 | 107,878.32 |
| HENNESSY VS - LIT | 10/28/10 | 7 | 443.89 | 386.18 | 2,703.26 |
| J WALKER BLACK - 1.75 | 6/28/11 | 40 | 432.96 | 339.91 | 13,596.40 |
| J WALKER BLACK - 750 | 6/28/11 | 15 | 423.29 | 363.29 | 5,449.35 |
| J WALKER BLACK - 750 GIFT | 5/2/11 | 20 | 211.64 | 184.13 | 3,682.60 |
| J WALKER BLACK - LIT | 6/28/11 | 107 | 460.42 | 460.42 | 49,264.94 |
| J WALKER BLUE - 750 | 6/28/11 | 36 | 1,146.54 | 997.49 | 35,909.64 |
| J WALKER DOUBLE BLACK - 750 | N/A | 30 | 229.65 | 199.80 | 5,994.00 |
| J WALKER GOLD - 750 | 6/28/11 | 14 | 926.29 | 805.87 | 11,282.18 |
| J WALKER RED - 1.75 | 12/7/11 | 5 | 213.31 | 185.58 | 927.90 |
| J WALKER RED - LIT | 6/28/11 | 37 | 317.88 | 276.56 | 10,232.72 |
| JACK DANIELS - 1.75 | 12/6/11 | 75 | 261.92 | 227.87 | 17,090.25 |

| | | | | | |
|---|---|---|---|---|---|
| JACK DANIELS - 750 | 11/29/11 | 40 | 267.28 | 232.53 | 9,301.20 |
| JACK DANIELS - LIT | 6/30/11 | 226 | 364.45 | 304.41 | 68,796.66 |
| KETEL ONE - 1.75 | 10/12/11 | 40 | 247.51 | 219.91 | 8,796.40 |
| KETEL ONE - LITER | 6/15/11 | 206 | 335.73 | 292.09 | 60,170.54 |
| KORBEL BRUT - 750 - 15PK | 12/19/11 | 40 | 149.40 | 129.98 | 5,199.20 |
| LAGAVULIN 16YR SCOTCH - 750 | N/A | 49 | 809.64 | 704.39 | 34,515.11 |
| MACALLAN 10YR - 750 | 7/14/11 | 5 | 419.88 | 365.30 | 1,826.50 |
| MAKERS MARK - 1.75 | 9/28/11 | 8 | 230.28 | 200.34 | 1,602.72 |
| MAKERS MARK - 750 | 9/28/11 | 5 | 246.84 | 214.75 | 1,073.75 |
| MAKERS MARK - LIT | 9/28/11 | 10 | 322.08 | 280.21 | 2,802.10 |
| MOET IMPERIAL - 750 GIFT | N/A | 10 | 224.94 | 195.70 | 1,957.00 |
| MOET NECTAR IMP ROSE - 750 | 3/2/11 | 13 | 332.94 | 289.66 | 3,765.58 |
| OBAN DISTILLERS EDITION - 750 | N/A | 25 | 379.62 | 330.27 | 8,256.75 |
| OBAN SCOTCH - 750 | 10/18/11 | 10 | 699.24 | 608.34 | 6,083.40 |
| REMY MARTIN VSOP - LIT | 6/1/11 | 11 | 616.89 | 536.69 | 5,903.59 |
| ROMANO SAMBUCCA - 750 | 4/29/10 | 1 | 287.88 | 250.46 | 250.46 |
| ROMANO SAMBUCCA - LITER | 12/31/10 | 5 | 347.57 | 302.39 | 1,511.95 |
| RUSSIAN STANDARD - 1.75 | N/A | 126 | 153.68 | 133.70 | 16,846.20 |
| SOUTHERN COMFORT - LIT | 8/30/11 | 38 | 209.95 | 182.66 | 6,941.08 |
| ST MARGHERITA PINOT GRIGIO 750 | 6/30/11 | 5 | 228.00 | 198.36 | 991.80 |
| STERLING VINT COL CAB SAUV-750 | N/A | 162 | 107.92 | 93.89 | 15,210.18 |
| STERLING VINT COL CHARD - 750 | 10/15/09 | 10 | 83.92 | 73.01 | 730.10 |
| STERLING VINT COL PINOT - 750 | N/A | 54 | 107.92 | 93.89 | 5,070.06 |
| STOLICHNAYA 80 - 1.75 | 11/23/09 | 109 | 198.96 | 165.90 | 18,083.10 |
| STOLICHNAYA 80 - LIT | 11/23/09 | 66 | 280.42 | 232.45 | 15,341.70 |
| STOLICHNAYA BLUEBERRY - LIT | 12/31/10 | 6 | 280.44 | 243.98 | 1,463.88 |
| STOLICHNAYA RASBERI - LIT | 12/21/09 | 16 | 280.44 | 243.98 | 3,903.68 |
| SVEDKA VODKA - 750 | N/A | 6 | 141.16 | 122.81 | 736.86 |
| SVEDKA VODKA - LITER | N/A | 10 | 166.22 | 144.61 | 1,446.10 |
| TALISKER 25YR SCOTCH - 750 | N/A | 4 | 600.00 | 522.00 | 2,088.00 |
| TANQUERAY GIN - 1.75 | 5/31/11 | 5 | 250.50 | 217.94 | 1,089.70 |
| TANQUERAY GIN - 750 | 5/31/11 | 25 | 270.88 | 235.67 | 5,891.75 |
| TANQUERAY GIN - LIT | 5/31/11 | 75 | 339.21 | 295.11 | 22,133.25 |
| VEUVE CLICQ YELLOW BR-750 GFT | N/A | 74 | 419.89 | 365.30 | 27,032.20 |
| VEUVE CLICQ YELLOW BRUT - 75 | 3/29/11 | 319 | 419.89 | 365.30 | 116,530.70 |
| WOODFORD RESERVE BOURBON - 75 | 2/24/11 | 4 | 178.62 | 155.40 | 621.60 |
| YELLOW TAIL CHARDONNAY - 1.5 | 4/8/10 | 60 | 56.60 | 49.24 | 2,954.40 |
| YELLOW TAIL SHIRAZ - 1.5 | 4/8/10 | 60 | 56.60 | 49.24 | 2,954.40 |
| Total | | 4,095 | | | 1,007,480.40 |